FAIRFAX AUTO PARTS OF NORTHERN VIRGINIA, INCORPORATED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

FAIRFAX AUTO PARTS, INCORPORATED, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT [1]

Docket Nos. 1458-74, 1459-74.    Filed January 26, 1976.

---

[1] These cases were consolidated for purposes of brief and opinion.

*James M. Rees* and *Jonathan J. Broome, Jr.,* for the petitioners.

*Frank J. Coyne,* for the respondent.

OPINION

STERRETT, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Docket No. | | | |
|---|---|---|---|
| 1458-74 | Fairfax Auto Parts of Northern Virginia, Inc. | 1971 | $3,250 |
| | | 1972 | 3,250 |
| 1459-74 | Fairfax Auto Parts, Inc. | 1971 | 3,250 |
| | | 1972 | 3,250 |

The deficiencies are based solely upon the disallowance by respondent of a full $25,000 surtax exemption to each petitioner during each of the taxable years at issue pursuant to section 1561, I.R.C. 1954,[2] as in effect for those years. The only issue for our decision is whether petitioners were component members of a controlled group thereby making the provisions of section 1561 applicable.

The case was submitted under Rule 122, Tax Court Rules of Practice and Procedure. Hence, all of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioner Fairfax Auto Parts of Northern Virginia, Inc. (hereinafter NOVA), is a Virginia corporation. Its principal office was located in Fairfax, Va., at the time it filed its petition herein. NOVA's corporate income tax returns for the taxable years ended December 31, 1971, and December 31, 1972, were filed with the District Director of Internal Revenue, Richmond, Va.

Petitioner Fairfax Auto Parts, Inc. (hereinafter FAP), is a Virginia corporation and had its principal office in Fairfax, Va.,

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended.

SEC. 1561. SURTAX EXEMPTIONS IN CASE OF CERTAIN CONTROLLED CORPORATIONS.

(a) GENERAL RULE.—If a corporation is a component member of a controlled group of corporations on a December 31, then for purposes of this subtitle the surtax exemption of such corporation for the taxable year which includes such December 31 shall be an amount equal to—

(1) $25,000 divided by the number of corporations which are component members of such group on such December 31, or * * *

at the time of the filing of its petition herein. Its corporate income tax returns for the taxable years ended December 31, 1971, and December 31, 1972, were filed with the District Director of Internal Revenue, Richmond, Va.

NOVA was incorporated under the laws of the State of Virginia on February 23, 1968. During the years 1971 and 1972 Joseph W. Ofano was primarily responsible for the actual operation of NOVA, which was engaged in the business of wholesaling auto parts. During this period he was not involved in the management of FAP.

The following persons were the officers of NOVA during the years in issue: William P. Herbert, president; Joseph W. Ofano, vice president; Katherine L. Herbert, treasurer; and Barbara E. Ofano, secretary. Barbara E. Ofano is the wife of Joseph W. Ofano and the sister of Katherine L. Herbert. William P. Herbert and Katherine L. Herbert are husband and wife. The board of directors of NOVA comprised these four persons during these years.

On December 31, 1971, and December 31, 1972, William P. Herbert owned 55 percent of all NOVA stock entitled to vote and 55 percent of the total value of all NOVA stock. On the same dates Joseph W. Ofano owned 45 percent of all NOVA stock entitled to vote and 45 percent of the total value of all NOVA stock.

FAP was incorporated under the laws of the State of Virginia on May 28, 1961. Although approximately 5 percent of its business activity was the customizing of auto parts, the principal business activity of FAP during the years 1971 and 1972 was the wholesaling of auto parts.

During the years at issue, William P. Herbert owned 100 percent of all FAP stock entitled to vote and 100 percent of the total value of all FAP stock, was president of FAP, and served on the board of directors thereof. Katherine L. Herbert was secretary-treasurer of FAP and was the only other member of its board of directors. There was no vice president of FAP during 1971 and 1972.

In computing their respective tax liabilities for 1971 and 1972 petitioners each utilized a full surtax exemption in the amount of $25,000 pursuant to section 11(d). Respondent determined that petitioners were component members of a brother-sister controlled group as defined in section 1563(a)(2) and in his notices of deficiency allocated to each a surtax exemption of

$12,500 for each taxable year involved herein. We must decide the correctness of respondent's determination.

On December 31, 1971, and December 31, 1972, petitioners' issued and outstanding stock was held as follows:

|  | NOVA | FAP |
|---|---|---|
| William Herbert _____ | 55% | 100% |
| Joseph Ofano_____ | 45% | --- |

Respondent takes the position that this pattern of ownership brings petitioners squarely within the definition of a brother-sister controlled group contained in section 1563(a)(2). That section provides:

SEC. 1563. DEFINITIONS AND SPECIAL RULES.

(a) CONTROLLED GROUP OF CORPORATIONS.—For purposes of this part, the term "controlled group of corporations" means any group of—

   * * *

(2) BROTHER-SISTER CONTROLLED GROUP.—Two or more corporations if 5 or fewer persons who are individuals, estates, or trusts own (within the meaning of subsection (d)(2)) stock possessing—

   (A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and

   (B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.

In support thereof he cites section 1.1563-1(a)(3), Income Tax Regs., which defines a brother-sister controlled group as two or more corporations if,

the same five or fewer persons * * * own * * * *singly or in combination,* stock possessing—

(a) At least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation; and

(b) More than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.

[Emphasis supplied.]

Respondent also points to example 1 [3] of this regulation as being

---

[3] Sec. 1.1563-1(a)(3)(ii):

The principles of this subparagraph may be illustrated by the following examples:

dispositive of the issue before us.

Petitioners concede that the ownership pattern involved herein satisfies the 50-percent test set forth in section 1563(a)(2)(B). They argue, however, that the 80-percent test contained in section 1563(a)(2)(A) has not been met, taking the position that a person's stock ownership cannot be taken into account for this purpose unless that person owns stock in each corporation involved. In this connection, petitioners agree that the ownership pattern in the instant case falls within the definition set forth in respondent's regulation and illustrated by the example contained therein but assert that the regulation constitutes a totally unwarranted extension of both the statutory language of section 1563(a)(2) and the underlying congressional intent. We agree with petitioners.

Respondent's regulation interprets the language of section 1563(a)(2)(A) to mean that if some combination of a particular group of (five or fewer) persons owns at least 80 percent of two or more corporations the 80-percent test is satisfied. The crucial language in this regard is the words "singly or in combination." Thus, while the ownership group (of five or fewer persons) must in the aggregate own at least 80 percent of each of the corporations constituting the controlled group, the same persons within the ownership group need not own 80 percent of each component member of the controlled group. We find the contested regulation to be an unrealistic and unreasonable interpretation of the statutory language.

The key words of the statute relevant to an analysis of the issue are:

if 5 or fewer persons * * * own * * *

(A) at least 80 percent * * * of each corporation, and

---

*Example (1).* The outstanding stock of corporations P, Q, R, S, and T, which have only one class of stock outstanding, is owned by the following unrelated individuals:

| Individuals | Corporations | | | | | Identical ownership |
|---|---|---|---|---|---|---|
| | P | Q | R | S | T | |
| A | 60% | 60% | 60% | 60% | 100% | 60% |
| B | 40% | --- | --- | --- | --- | --- |
| C | --- | 40% | --- | --- | --- | --- |
| D | --- | --- | 40% | --- | --- | --- |
| E | --- | --- | --- | 40% | --- | --- |
| Total | 100% | 100% | 100% | 100% | 100% | 60% |

Corporations P, Q, R, S, and T are members of a brother-sister controlled group.

(B) more than 50 percent * * * of each corporation, taking into account the stock ownership of *each such person* only to the extent such stock ownership is identical with respect to each such corporation. [Sec. 1563(a)(2). Emphasis supplied.]

Since the "five or fewer persons" is the conjunctive subject of both the 80-percent test and the 50-percent test, it cannot be gainsaid that both tests must be satisfied by the same ownership group. However, to gain entrance into the ownership group for purposes of the 50-percent test one must possess stock in each corporation involved since an absence of such stock ownership produces an identical stock ownership of zero or, put another way, no stock ownership at all. If ownership of stock in each corporation involved is a precondition to membership in the ownership group for purposes of the 50-percent test, and the ownership groups for the 50-percent test and 80-percent test are one and the same, it follows in our mind that one must own stock in each corporation before his stock can be taken into account for purposes of the 80-percent test.

Furthermore, the language of the 50-percent test comports with this analysis. The words "each such person" appearing therein refer to the "five or fewer persons" constituting the ownership group for purposes of both the 80-percent and 50-percent tests. The import of such usage is that each person—and not just some of the persons—counted for purposes of the 80-percent test must be also counted for purposes of the 50-percent test. To interpret the statutory language as respondent has done in his regulation is plainly inconsistent with the thrust of the statutory language. Hence, we hold that for a person's stock ownership to be taken into account for purposes of the 80-percent test that person must own stock in each member of the brother-sister controlled group. Since respondent's regulations advance a contrary interpretation, we hold them, to that extent, invalid. *United States v. Cartwright,* 411 U.S. 546 (1973).

Our holding today is in accord with the legislative history and basic purpose of sections 1561 and 1563. These provisions were enacted as part of the Revenue Act of 1964, 78 Stat. 116, to buttress respondent's arsenal of weapons employed to combat the proliferating utilization of the multicorporate form by businesses that were essentially a single enterprise. Joint Comm. on Internal Revenue Taxation, 88th Cong., 1st Sess., Summary of the President's 1963 Tax Message 45 (April 1963); H. Rept. No. 749,

88th Cong., 1st Sess. (1963), 1964-1 C.B. (Part 2) 240-241; S. Rept. No. 830, 88th Cong., 2d Sess. (1964), 1964-1 C.B. (Part 2) 653-655. The target of these provisions being multiple corporations capable of operation as a single corporation, it is obvious that Congress intended them to reach only corporations characterized by *common* control and ownership. The definition of a brother-sister controlled group proposed by the Treasury Department recognized as much. Under this proposal five or fewer persons were required to own at least 80 percent of each component member of the controlled group. However, a person's stock ownership was not to be taken into account unless he owned stock in each such corporation. Hearings on the President's 1963 Tax Message Before the House Comm. on Ways and Means, 88th Cong., 1st Sess., 77 (1963).[4]

Although section 1563(a)(2), as amended by sec. 401, Tax Reform Act of 1969, 83 Stat. 599, expanded the ownership group for brother-sister controlled groups to five persons, it was not intended to alter the target groups at which the multicorporation provisions were aimed. In its explication of the amendment, the General Explanation of Treasury Tax Reform Proposals demonstrates clearly that, notwithstanding the amendment, *common* control and ownership remain the touchstones of these provisions. It states, in pertinent part:

(2) *Brother-sister groups.*—A group of corporations in which five or fewer persons own, to a large extent in *identical proportions,* at least 80 percent of the stock of each of the corporations. This provision expands present law by considering the combined stock ownership of five individuals, rather than one individual, in applying the 80-percent test. Even the mild 6-percent penalty under existing law for brother-sister corporations claiming multiple surtax exemptions is largely ineffectual because of the present requirement that one person own 80 percent ot the stock of each corporation before the group of corporations is subject to the penalty.

However, in order to insure that this expanded definition of brother-sister controlled group applies only to those cases where the five or fewer individuals hold their 80 percent in a way which allows them to operate the corporations as *one economic entity,* the proposal would add an additional rule that the ownership of the five or fewer individuals must constitute more than 50 percent of the stock of each corporation considering, in this test of ownership, stock of a particular person only to the extent that it is owned identically with respect to each corporation. [Fn. ref. omitted. Emphasis supplied.]

---

[4] When the legislation was reported to the House, the definition had been altered to two or more corporations owned 80 percent by the same person. No explanation for this change appears in the legislative history.

Hearings on the Subject of Tax Reform Before the House Comm. on Ways and Means, 91st Cong., 1st Sess., 5394 (1969). See also Joint Comm. on Internal Revenue Taxation, 91st Cong., 1st Sess., Tax Reform Studies and Proposals, U.S. Treasury Dept., part 2, 245 (Comm. Print 1969).

Common ownership and control being the sine qua non of a brother-sister controlled group, it is obvious to us that a shareholder must be denied admission to the ownership group absent stock ownership in every member of the controlled group. A contrary interpretation of section 1563(a)(2) would simply do violence to the statutory language and legislative history thereof.

Respondent, however, urges that we sanction his statutory interpretation as evidenced by the aforenoted regulation to preclude an easy path on which to bypass controlled group status in the brother-sister context. We do not find it a realistic belief that an individual would dispose of his entire interest in a corporation to enable that corporation and its remaining shareholders to reap the financial benefits of a full surtax exemption. To the contrary, respondent's interpretation permits him to snare with the definitional web woven by the words "singly or in combination" corporations that Congress never intended to bring within the ambit of the multicorporate provisions.[5]

By the same token, respondent's interpretation is contrary to the function of the 80-percent test and its concomitant interrelationship with the 50-percent test. Manifest from the legislative history is the proposition that the 50-percent test is one of control, drawn to insure that the members of the controlled group could be organized and operated as one corporation. Hearings on the Subject of Tax Reform Before the House Comm. on Ways and Means, 91st Cong., 1st Sess. 5396 (1969). The 50-percent test being the control test, it is apparent that the 80-percent test is one of financial interest. Together, the tests assure that the sanctions imposed by section 1561 are

---

[5] A prime example is a variant of the factual situation involved herein. Individual A owns 55 percent of corporation X and individual B owns 45 percent thereof. If A were independently to enter into a second business in corporate form the corporations would be component members of a controlled group. We cannot believe that Congress intended to surprise B with such a result. We recognize that had A owned 80 percent of corporation X and B 20 percent thereof, the corporations would constitute a controlled group. However in the latter instance, B's unfortunate surprise would be necessitated by both the mechanical application of the stock ownership tests and the respective functions of the 80 percent and 50 percent tests discussed *infra.*

applied only in those instances where the evil sought to be remedied rears its head, i.e., where those in control of two or more corporations are utilizing the multicorporate form to obtain an unwarranted financial benefit. To allow the 80-percent ownership test to be satisfied with stock of a person owning stock in only one corporation, i.e., a person not within the control group, would simply ignore the basic function of the 80-percent test.

We think the foregoing serves to dispose of the issue before us, but believe it imperative to add a few words in regard to one other argument raised by the parties.[6] They correctly assert that Congress intended the stock ownership test of section 1563(a)(2) to be the same as the test employed in section 1551(b)(2).[7] H. Rept. No. 91-413, 91st Cong., 1st Sess. (1969), 1969-3 C.B. 384. Both parties make reference to section 1.1551-1, Income Tax Regs., as being relevant to the disposition of the present case.[8]

---

[6] Respondent has also cited *North American Industries, Inc.,* T.C. Memo. 1974-276. However, the issue before us was neither raised nor considered in that case.

[7] SEC. 1551. DISALLOWANCE OF SURTAX EXEMPTION AND ACCUMULATED EARNINGS CREDIT.

(b) CONTROL.—For purposes of subsection (a), the term "control" means—

\* \* \*

(2) With respect to each corporation described in subsection (a)(3), the ownership by the five or fewer individuals described in such subsection of stock possessing—

(A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and

(B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such individual only to the extent such stock ownership is identical with respect to each such corporation.

[8] Petitioners point to sec. 1.1551-1(f)(2), ex. 2, Income Tax Regs., in support of their position. It reads:

*Example (2).* On June 20, 1963, individual A, who owns all of the stock of corporation X, transfers property (other than money) to corporation Y, a corporation not actively engaged in business at the time of the acquisition of such property, in exchange for 60 percent of the voting stock of Y. During a later taxable year of Y, A acquires an additional 20 percent of such voting stock. After such acquisition A owns at least 80 percent of the voting stock of corporations X and Y. Accordingly, section 1551(a)(3) is applicable for the taxable year in which the later acquisition of stock occurred and for each taxable year thereafter in which the requisite control continues.

In support of his position respondent points to sec. 1.1551-1(g)(4), ex. 4, Income Tax Regs., which states:

*Example (4).* Individual A owns 55 percent of the stock of corporation X. Another 25 percent of corporation X's stock is owned in the aggregate by individuals B, C, D, and E. On June 15, 1963, individual A transfers property to corporation Y (newly created for the purpose of acquiring such property) in exchange for 60 percent of the stock of Y, and B, C, and D acquire all of the remaining stock of Y. The transfer is within the scope of section 1551(a)(3).

The apparent inconsistency can be resolved by the interpretation that follows above.

Briefly, this regulation interprets the 80-percent test of section 1551(b)(2) to require that the five or fewer persons who own 80 percent of the transferee also be *one or more* of the five or fewer persons who own 80 percent of the transferor; however, there is no requirement that each of the persons who own 80 percent of the transferor corporation must also own stock in the transferee corporation. While we express no opinion regarding this interpretation of section 1551(b)(2), we note that it is not a viable interpretation of section 1563(a)(2). If NOVA were deemed to be the transferor corporation, under such an interpretation NOVA and FAP would constitute a brother-sister controlled group. If FAP were deemed the transferor corporation they would not. Since respondent has pointed to no method of determining which corporation is to be regarded as the transferor, and we find none ourselves, we cannot engraft such an interpretation on section 1563(a)(2).

In view of our holding, the 45-percent stock ownership in NOVA held by Joseph Ofano cannot be counted for purposes of the 80-percent test. Since that test is not satisfied by the stock ownership of William Herbert,

*Decisions will be entered for the petitioners.*
Reviewed by the Court.

SIMPSON, *J.,* dissenting: In its opinion, the majority invalidates provisions of the Treasury regulations which deal with a highly complex and technical statute and which constitute a contemporaneous construction of the statute by those charged with the administration of the revenue laws. The cases are legion in which the Supreme Court has, time and again, held that such regulations are entitled to great weight and will be declared invalid only if they are unreasonable and clearly inconsistent with the statute. *Bingler v. Johnson,* 394 U.S. 741, 749-750 (1969); *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501 (1948); *Fawcus Machine Co. v. United States,* 282 U.S. 375, 378 (1931); *Estate of Whitlock v. Commissioner,* 494 F. 2d 1297, 1300-1301 (10th Cir. 1974), revg. on this issue 59 T.C. 490 (1972); Griswold, "A Summary of the Regulations Problem," 54 Harv. L. Rev. 398, 405-408, 416, 417 (1941); see also *United States v. Correll,* 389 U.S. 299, 307 (1967); *Colgate Co. v. United States,* 320 U.S. 422, 426 (1943); *Brewster v. Gage,*

280 U.S. 327, 336 (1930). The majority declares that the regulations are "unrealistic and unreasonable" and that they are "clearly inconsistent with the thrust of the statutory language." However, they failed to establish, in the statute or legislative history, any basis for their assertions, and a careful reading of the statute reveals that the regulations are, in fact, entirely consistent with the statute and legislative history. Thus, there is no basis in law for this Court to refuse to apply the regulations. What is more, the regulations, now rejected by the majority of this Court, have been impliedly approved by the Congress in subsequent legislation.

Section 1563(a)(2) provides:

(a) CONTROLLED GROUP OF CORPORATIONS.—For purposes of this part, the term "controlled group of corporations" means any group of—
* * *
(2) BROTHER-SISTER CONTROLLED GROUP.—Two or more corporations *if five or fewer persons* who are individuals, estates, or trusts own (within the meaning of subsection (d)(2)) stock possessing—
(A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and
(B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, *taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.*
[Emphasis supplied.]

Although, on a quick reading, the statute appears complex, an analysis of subparagraph (A), containing the 80-percent test, and subparagraph (B), containing the 50-percent test, shows that the only substantive difference is the underscored language in subparagraph (B), which places a limitation on the application of the 50-percent test not applicable to the 80-percent test. The stock owned by any or all of the five persons may be taken into consideration in determining whether the 80-percent test has been satisfied, but in determining whether the 50-percent test has been met, it is necessary to find out which of such persons owns stock in both of the corporations and how much each of them owns. Only to the extent that a person owned stock in each of the corporations is his stock taken into consideration for purposes of the 50-percent test; thus, a person who owned no stock in one of the corporations under scrutiny would be excluded

from consideration for purposes of that test. Yet, since. Mr. Herbert owned more than 50 percent of the stock in each of the corporations involved in this controversy, it is clear that the 50-percent test has been satisfied, and since the common ownership requirement is applicable only for that test, and not the 80-percent test, the ownership of both Mr. Herbert and Mr. Ofano should be taken into consideration in applying the 80-percent test. Obviously, together, their ownership satisfies that test. Thus, when the statute is read carefully, there can be no doubt that it applies in this case and that the regulations are entirely consistent with it.

The purpose and operation of the 80-percent and 50-percent tests are illuminated by the legislative history. As originally enacted by the Revenue Act of 1964, section 235(a), 78 Stat. 116, section 1563(a)(2) defined a brother-sister controlled group to be two or more corporations, if 80 percent of the total combined voting power, or 80 percent of the total combined value of the shares, were owned by *one* person. Apparently, the Treasury Department and the Congress found such rule failed to prevent the abuses at which it was aimed, and the Tax Reform Act of 1969, sec. 401(c), 83 Stat. 599, changed the rule. To make the rule applicable in more situations, the stock ownership of up to five persons is to be taken into consideration for purposes of applying the 80-percent test, but to assure that there was common control of each of the corporations by some of such persons, the 50-percent test was added.

The general explanation of the Treasury Tax Reform Proposals contained in Hearings on the Subject of Tax Reform Before the House Comm. on Ways and Means, 91st Cong., 1st Sess. 5394 (1969), sets forth the reasons for the new provisions:

(2) *Brother-sister groups.*—A group of corporations in which five or fewer persons own, *to a large extent in identical proportions,* at least 80 percent of the stock of each of the corporations. This provision expands present law by considering the combined stock ownership of five individuals, rather than one individual, in applying the 80-percent test. Even the mild 6-percent penalty under existing law for brother-sister corporations claiming multiple surtax exemptions is largely ineffectual because of the present requirement that one person own 80 percent of the stock of each corporation before the group of corporations is subject to the penalty.

*However, in order to insure that this expanded definition of brother-sister controlled group applies only to those cases where the five or fewer individuals hold their 80 percent in a way which allows them to operate the corporations as*

*one economic entity, the proposal would add an additional rule that the ownership of the five or fewer individuals must constitute more than 50 percent of the stock of each corporation considering, in this test of ownership, stock of a particular person only to the extent that it is owned identically with respect to each corporation.*

[Fn. ref. omitted; emphasis supplied.]

Such explanation supports the interpretation adopted by the regulations. The second paragraph of the explanation, which has been *underscored,* makes clear that different persons may be taken into consideration in applying the 80-percent and the 50-percent tests and that the common ownership requirement is only applicable for purposes of the 50-percent test. Moreover, the *underscored* words in the first sentence of the explanation merely indicate that there will be common ownership "to a large extent" among those persons whose ownership is considered for purposes of the 80-percent test. That statement recognizes that there need not be common ownership among all those persons taken into consideration for purposes of the 80-percent test, and the common ownership that is requred is specified by the 50-percent test.

In addition, when in 1969 Congress decided to expand the coverage of section 1563, it used exactly the same words to describe the brother-sister corporations to be covered as were used in section 1551(b)(2) and indicated that it intended for such provisions to have the same meaning. H. Rept. No. 91-413 (1969), 1969-3 C.B. 200, 384. At that time, section 1.1551-1(g)(4) of the Income Tax Regulations included an example indicating that the ownership of a person could be taken into consideration for purposes of the 80-percent test although he did not own stock in some of the corporations and was therefore not considered for the purposes of the 50-percent test. Under these circumstances, it is reasonable to assume that the draftsmen of section 1563 were aware of such regulations and therefore intended for the definition to include the situation described in it. Since sections 1551(b)(2) and 1563(a)(2) define brother-sister groups of corporations by use of the same words, and since Congress indicated that the two definitions should have the same meaning, we should interpret them to include the same groups of corporations, and for this purpose, it is immaterial that section 1551 applies when there is a transfer of property and that section 1563 applies without a showing of a transfer of property.

Moreover, when Congress enacted the Employee Retirement Income Security Act of 1974, sec. 1015, 88 Stat. 925, it added section 414 to the Code, providing in subsections (b) and (c):

(b) EMPLOYEES OF CONTROLLED GROUP OF CORPORATIONS.—For purposes of sections 401, 410, 411, and 415, all employees of all corporations which are members of a controlled group of corporations (within the meaning of section 1563(a), determined without regard to section 1563(a)(4) and (e)(3)(C)) shall be treated as employed by a single employer. With respect to a plan adopted by more than one such corporation, the minimum funding standard of section 412, the tax imposed by section 4971, and the applicable limitations provided by section 404(a) shall be determined as if all such employers were a single employer, and allocated to each employer in accordance with regulations prescribed by the Secretary or his delegate.

(c) EMPLOYEES OF PARTNERSHIPS, PROPRIETORSHIPS, ETC., WHICH ARE UNDER COMMON CONTROL.—For purposes of sections 401, 410, 411, and 415, under regulations prescribed by the Secretary or his delegate, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer. The regulations prescribed under this subsection shall be based on principles similar to the principles which apply in the case of subsection (b).

At the time of such enactment, certain legal writers had criticized the regulations under section 1563 which the majority now invalidates. Bonovitz, "Brother-Sister Controlled Groups under Section 1563: The 80 Percent Ownership Test," 28 Tax Lawyer 511 (1975); Thomas, "Brother-Sister Multiple Corporations—The Tax Reform Act of 1969 Reformed by Regulation," 28 Tax L. Rev. 65 (1972); but see White, "The Tax Reform Act of 1969: Demise of Multiple Surtax Exemptions— When Too Much of A Good Thing Proved Its Own Undoing," 16 Wayne L. Rev. 1353 (1970). Nevertheless, Congress adopted the meaning of a controlled group of corporations set forth in section 1563 and even decided that the same principles should be made applicable to unincorporated businesses. By such action, Congress clearly indicated its approval of the manner in which section 1563 was being interpreted and applied by the Treasury regulations. Cf. *United States v. Correll,* 389 U.S. 299, 305-306 (1967); *Commissioner v. Flowers,* 326 U.S. 465, 469 (1946); *Boehm v. Commissioner,* 326 U.S. 287, 291-292 (1945); *Helvering v. Winmill,* 305 U.S. 79, 83 (1938); *Bernard McMenamy,* 54 T.C. 1057, 1062 (1970), affd. 442 F. 2d 359 (8th Cir. 1971).·

The majority attempts to create an ambiguity by overlooking the obvious meaning of the words of the statute. They point to

the words "the stock ownership of each such person" and suggest that these words indicate that each of the persons who is considered in applying the 80-percent test must own stock in each of the corporations. They recognize that the identical ownership requirement is applicable only for purposes of the 50-percent test, but they claim that those words also serve to place some limitation on the applicability of the 80-percent test. Such interpretation of the statute overlooks the obvious fact that those words are contained in subparagraph (B); they restrict the applicability of the 50-percent test but have absolutely nothing to do with the 80-percent test.

Although there is no basis in the statute or legislative history for doing so, the majority assumes that the legislation was not intended to cover such a situation as the one now before us. They, like some of the legal writers, disagree with the results of the regulations. Bonovitz, *supra;* Thomas, *supra;* but see White, *supra.* They believe that since Mr. Ofano owned none of the stock of FAP, it would be unfair to him to apply section 1563 and limit the surtax exemption of NOVA. They recognize that if he owned as little as 1 share of FAP, the limitation would apply. They also admit that if his ownership of NOVA was less than 20 percent, NOVA would have to share its surtax exemption even though he owned none of the stock of FAP and was surprised to learn that Mr. Herbert had another wholly owned corporation. Thus, without any authorization in the statute or legislative history, the majority is attempting to define when section 1563 should be applied, and when it should not be.

In this situation, it is well to remind the majority of the words of the Supreme Court in *United States v. Correll,* 389 U.S. at 306-307:

we do not sit as a committee of revision to perfect the administration of the tax laws. Congress has delegated to the Commissioner, *not to the courts,* the task of prescribing "all needful rules and regulations for the enforcement" of the Internal Revenue Code. 26 U.S.C. § 7805(a). In this area of limitless factual variations, *"it is the province of Congress and the Commissioner, not the courts, to make the appropriate adjustments."* * * * [Emphasis supplied.]

For many years, Congress has been concerned about the use of multiple corporations to secure additional surtax exemptions. Sections 269 and 1551 were designed to limit such use, but their applicability depends upon a showing as to the purpose of the creation or acquisition of a corporation. Neither Congress nor the

Treasury was satisfied with the results achieved by those provisions, and when section 1563 was enacted, they decided to adopt a mechanical or objective test. As a result of the 50-percent test, the applicability of the provision is restricted to situations in which a small group of persons has actual control of each of the several corporations, and as a result of the 80-percent test, the applicability of the provision is restricted to situations in which substantially all of the stock of each of the corporations is held by a small group of persons. For my part, I cannot say that those provisions are arbitrary or irrational, and as a court, it seems to me that we should refrain from adopting an interpretation of them which will limit their applicability. If the reach of the statute is too broad, the remedy lies with Congress. Although some of my colleagues may be firmly convinced that the statute should have been written more narrowly, it is not for us to usurp the policymaking responsibilities of the Congress.

RAUM, TANNENWALD, and WILBUR, *JJ.,* agree with this dissent.