CHARLES BALOIAN COMPANY, INC., PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 8258–75. Filed July 27, 1977.

*Charles F. Hamlin* and *Robert G. Carter,* for the petitioner.
*Benjamin C. Sanchez,* for the respondent.

FORRESTER, *Judge:* Respondent has determined the following deficiencies in petitioner's Federal income tax:

| TYE June 30— | Deficiency |
|---|---|
| 1971 | $16,934.61 |
| 1972 | 12,750.34 |

Concessions having been made, the following issues are presented for our decision:

(1) Whether petitioner is entitled to deduct moving expenses incurred and accrued in its fiscal year ended June 30, 1971, and, if such deduction is allowable, whether the amount of subsequent reimbursement for such expenses is includable in its gross income; and

(2) Whether petitioner and Pam-Pak Distributors, Inc., constitute a "brother-sister controlled group" within the meaning of section 1563(a)(2).[1]

### FINDINGS OF FACT

All of the facts have been stipulated and are so found. Those necessary to an understanding of the case are as follows.

Charles Baloian Co., Inc. (hereinafter petitioner), was incorporated on July 1, 1959, under the laws of the State of California. At the time its petition herein was filed, its principal office was located in Fresno, Calif. Petitioner, an accrual basis taxpayer, filed its Federal income tax returns for fiscal year ended June 30, 1971, with the Internal Revenue Service Center, Ogden, Utah, and its return for fiscal year ended June 30, 1972, was filed with the Internal Revenue Service Center, Fresno, Calif.

As of February 25, 1971, petitioner was leasing its place of business located at 1340 G Street, Fresno, Calif. By written

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954.

notice of this same date, the Redevelopment Agency of the City of Fresno (hereinafter the agency) notified petitioner as follows:

The Fresno Redevelopment Agency has purchased the building in which your business is located. The building may be scheduled for demolition sometime in the future in order to carry out Fresno's Urban Renewal Program. However, you will be given adequate notice of any demolition schedules which may affect you and the relocation staff will help you to relocate your business if you need assistance.

Federal Regulations require the Agency to give all owners and tenants a 90 Day Occupancy Notice. This means that from this date you have at least 90 days before you must vacate. Depending on the Agency's schedule of activities, you may be able to remain in this dwelling for a considerably longer time.

If you decide to move to another location, please notify us at least 30 days in advance of the date you plan to move. At that time, your eligibility for payment of your moving expenses, any direct loss of property payment, and a Small Business Displacement Payment should be reviewed with the relocation staff.

Sometime between February 25, 1971, and May 20, 1971, petitioner submitted to the agency a claim for relocation payments of $16,967 as reimbursement for moving expenses it expected to incur as a result of the displacement. On May 20, 1971, the agency issued to petitioner a document, entitled "Authorization to Incur Moving Costs," which stated that petitioner was authorized to incur moving costs up to $16,967. This authorization provided, in part, as follows:

You are hereby authorized to arrange to move your personal property in accordance with the above information. Immediately following your move submit Form H–6146, "Claim for Relocation Payment", in duplicate to the Redevelopment Agency. (Forms available at the Agency office). Attach TWO COPIES of vouchers from the mover and/or other contractors which perform services for you in connection with your moving arrangements. * * *

Petitioner actually moved from its business location by June 30, 1971. On its return for its taxable year ending on that date, petitioner claimed a moving expense deduction of $18,008.80. Petitioner subsequently submitted to the agency a request for a moving expense reimbursement of $17,120 and, on January 17, 1972, the agency issued to petitioner a check for the requested amount. In his notice of deficiency, respondent, inter alia, denied petitioner's claimed deduction of $18,008.80 to the extent of the $17,120 reimbursement.

A brochure explaining the agency's procedures involved in the processing and payment of claims for moving expenses incurred in connection with forced relocation provides, in pertinent part, as follows:

A program is administered by the Redevelopment Agency of the City of Fresno whereby eligible businesses may claim a relocation payment for their reasonable and necessary moving expenses * * *
　* * *

The Claimant shall prepare a typed or printed inventory of equipment and merchandise to be moved, including a list of equipment which must be disconnected, reconnected or reinstalled. The required forms for the inventory are available at the Agency Office. The inventory shall then be checked by a representative of the Relocation Staff for verification. At least three firm bids shall be solicited by the Agency from reputable moving firms and, to the extent required, other contractors. For all moves, the low bid will establish the maximum amount the Agency will pay.
　* * *

After receiving from the Agency a written authorization to incur expenses, it is the claimant's responsibility to follow up with the mover and other contractors to arrange for the actual move.

The Relocation Staff must be notified of the exact moving date by telephone or personal visit to the Agency Office, at least one day prior to the move so that a representative of the Agency may be present at the time of the move if it is deemed necessary.
　* * *

The following documentation must be submitted in order to claim moving costs:

1. A copy of the inventory of stock and fixtures that were moved.

2. Form FRA.-Reloc. 14, "Authorization to Incur Moving Costs".

3. Two copies of all bills or invoices for services rendered during the move.

4. Two copies of Forms H–6146.1 and H–6146.2, "Claim for Relocation Payment" (available at Agency Office).
　* * *

An entire claim, or portion thereof, may be disallowed for any of the following reasons:

A. Failure to give the Agency 30 to 90 days written notice of intention to move.

B. The claimant moves from a building prior to the date of the original capital grant contract for the project in which he is an occupant.

C. The claimant has defaulted in his rent or other obligations to the Agency.

D. The claimant submits his claim after the 6 month allotted time period, following his move.

E. The claimant submits bills, receipts, appraisals, claims, or other written evidence which is false or insufficient to establish the validity of his claim for moving expense or direct loss of property.

Petitioner is engaged in the business of buying, packing, shipping, and selling produce on the wholesale level. Petitioner has capital stock issued in the amount of $150,000. At all material times, its stock has been held equally by Charles Baloian, Edward Baloian, and James Baloian.

Pam-Pak Distributors, Inc. (hereinafter Pam-Pak), is a California corporation that was incorporated on March 17, 1966. Pam-Pak is engaged in the business of growing, packing, shipping, buying, and selling fruits and vegetables primarily in interstate commerce.

Pam-Pak has capital stock issued in the amount of $25,000 that is held as follows:

| Shareholder | Percentage of stock ownership | Shareholder | Percentage of stock ownership |
|---|---|---|---|
| Charles Baloian | 26 | James Baloian | 26 |
| Edward Baloian | 26 | Milton Torigian | 22 |

In his notice of deficiency respondent determined that petitioner and Pam-Pak were members of a "brother-sister controlled group" as defined in section 1563(a)(2) and disallowed, in whole or in part, certain deductions, exemptions, and investment credits petitioner had claimed on its returns for the years at issue.

OPINION

### Issue 1. Deductibility of Moving Expenses

By a letter dated February 25, 1971, the agency informed petitioner that the building in which it was then conducting its business operations was scheduled for demolition and that petitioner had at least 90 days within which to vacate such building. In that same letter, the agency explained that, because of this forced relocation, petitioner might be eligible for payment of moving expenses. Subsequently, petitioner submitted to the agency a claim for moving expense payments in the amount of $16,697 and, on May 20, 1971, the agency issued to petitioner a written authorization to incur moving expenses up to that amount.

Sometime between May 20 and June 30, 1971 (the end of petitioner's fiscal year), petitioner actually moved from its location and incurred moving expenses totaling $18,008.80. Petitioner subsequently submitted to the agency a request for reimbursement of $17,120 of this amount. On January 17, 1972, the agency issued to petitioner a check for $17,120.

On its return for fiscal year ending June 30, 1971, petitioner, an accrual basis taxpayer, deducted moving expenses of $18,008.80, of which, in his notice of deficiency, respondent disallowed $17,120.

Respondent offers two separate arguments in support of his proposed disallowance of $17,120 of the claimed deduction: (1) Petitioner's right to reimbursement of $17,120 matured prior to the date the expense was accrued, and (2) the deduction is allocable to tax-exempt income[2] and should be disallowed under section 265, which, inter alia, denies deductions for expenses allocable to such income.

Alternatively, respondent contends that, if the deduction is allowable, under the tax benefit rule petitioner should be deemed to have received income of $17,120 either in its fiscal year ending June 30, 1971, when respondent contends the right to recovery matured, or in its following fiscal year when the payment was actually received.

We agree with and hold for respondent based on his contention that petitioner's right to reimbursement matured prior to the accrual of the moving expense and, therefore, we need not reach his alternative arguments under section 265 or the tax benefit rule.

It has long been held that moving costs incurred in situations similar to that raised herein constitute ordinary and necessary business expenses. *Fowler & Union Horse Nail Co. v. Commissioner*, 16 B.T.A. 1071 (1929); *Eastern Shoe Manufacturing Co. v. Commissioner*, 8 B.T.A. 1169 (1927); *MacAdam & Foster, Inc. v. Commissioner*, 8 B.T.A. 967 (1927).

---

[2] The Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. secs. 4601 et seq. (1970), provides, inter alia, for the payment of moving expenses for any corporation that is forced to relocate as a result of Federal or federally assisted programs or projects. Congress specifically provided that such moving expense payments shall not be considered income for purposes of the Internal Revenue Code. 42 U.S.C. sec. 4636 (1970).

There exists, however, an equally well-settled rule that an accrual basis taxpayer is not allowed a deduction for an expense for which he has a fixed right to reimbursement through insurance or otherwise. *Glendinning, McLeish & Co. v. Commissioner*, 24 B.T.A. 518 (1931); *Patchen v. Commissioner*, 27 T.C. 592 (1956); *Hearn v. Commissioner*, 36 T.C. 672 (1961); 4A Mertens, Law of Federal Income Taxation, sec. 25.10, p. 65 (1972 rev.). A right to reimbursement is sufficiently fixed so as to deny the related expense deduction when such right has matured "without further substantial contingency." *Dally v. Commissioner*, 227 F.2d 724, 726 (9th Cir. 1955).

There exist two possible dates on which petitioner's right to reimbursement could be deemed sufficiently fixed so as to deny the related moving expense deduction: (1) February 25, 1971, when the initial notice to vacate was issued, or (2) May 20, 1971, when the agency issued to petitioner the authorization to incur moving expenses. Substantively, it makes no difference which of the two dates control since both occurred prior to the date the expense was accrued. Respondent contends that petitioner's right became fixed on February 25, 1971, but we think the better date is May 20, 1971.

The February 25 notice simply stated that the building petitioner was then leasing "may be scheduled for demolition sometime in the future" and that, if petitioner decided to move to a new location, its "eligibility for payment of * * * moving expenses * * * should be reviewed with the relocation staff" at that time. Such statements seem to us quite openended and cast doubt on whether the building would actually be demolished and, if so, whether petitioner would then be eligible for moving expense payments. Given the apparent uncertainty in these important areas, we are unable to conclude that petitioner's right to receive moving expense reimbursement became fixed at that time.

However, on May 20, 1971, the agency issued to petitioner a written authorization to incur moving expenses. This document spelled out in detail those companies that the agency had contracted to make the move and the respective costs of their services. It further set forth the maximum amount of moving costs for which the agency would pay, followed by a statement that "You are hereby authorized to arrange to

move your personal property in accordance with the above information." After receipt of this authorization, it remained only for petitioner to arrange for the actual move and to notify the agency at least 1 day prior thereto.

Petitioner points to the fact that, after the move and before payment could be made, it had to submit an additional form entitled "Claim for Relocation Payment" in order to secure actual payment. Petitioner submits that it was only after this document had been processed and approved did its right to payment become fixed. We disagree. The record before us shows that the primary substantive considerations and decisions relating to petitioner's eligibility for reimbursal were made prior to the issuance of the written authorization and that, once authorization had been secured, subsequent approval of the claim was simply a ministerial act the agency was required to perform. The fact that actual payment must await the performance of certain ministerial or mechanical acts on the part of a third person or governmental agency does not render the payment contingent. *Continental Tie & Lumber Co. v. United States*, 286 U.S. 290 (1932); *Dally v. Commissioner, supra.*

Even if the right to reimbursement is fixed, the related expense deduction cannot be disallowed unless the taxpayer has sufficient information and data at his command so as to be able to ascertain within reasonable limits the quantum of the reimbursement. *Continental Tie & Lumber Co., supra* at 296. Viewed from this standpoint, we are even more convinced that May 20, 1971, is the proper date upon which to focus since it was not until such time that petitioner received the agency's estimate of what the move would cost and how much would be reimbursed.

Petitioner further contends that its right to reimbursement cannot be deemed to have matured prior to the accrual of the expense since, under the agency's rules and regulations, an entire claim, or portion thereof, could have been disallowed for the following five reasons:

Failure to give the Agency 30 to 90 days written notice of intention to move.

The claimant moves from a building prior to the date of the original capital grant contract for the project in which he is an occupant.

The claimant has defaulted in his rent or other obligations to the Agency.

The claimant submits his claim after the 6 month allotted time period, following his move.

The claimant submits bills, receipts, appraisals, claims, or other written evidence which is false or insufficient to establish the validity of his claim for moving expense or direct loss of property.

The mere existence of a contingency, in and of itself, is insufficient to prevent fixation of the right, *Burnett v. Commissioner,* 356 F.2d 755 (5th Cir. 1966), and the proper test to be applied is whether such right has matured without substantial contingency. *Dally v. Commissioner, supra.* We simply cannot conclude that any of the aforementioned possible reasons for denial raise contingencies of sufficient magnitude to prevent fixation of the right at issue.

Finally, petitioner argues that its case is controlled by our prior opinion in *Electric Tachometer Corp. v. Commissioner,* 37 T.C. 158 (1961). We think this case is quite clearly distinguishable. In that case, the petitioner was notified in 1954 by the State of Pennsylvania that its property would be condemned. In 1955, petitioner was formally evicted and incurred moving expenses in that year and in 1956. In 1957, petitioner instituted legal proceedings to determine the proper amount of damages it should be awarded. A Board of View held hearings on this matter on four different occasions in 1957, at which expert witnesses for both petitioner and the State testified. These witnesses gave widely varying estimates as to the moving expenses petitioner incurred. Later in 1957, the parties agreed to settle the whole matter upon the payment of a certain sum to petitioner. Respondent, in that case, disallowed petitioner's claimed 1955 and 1956 moving expense deductions because he alleged that petitioner had a fixed right to reimbursement in those years.

In holding that petitioner had no fixed right to reimbursement in 1955 or 1956, we stated as follows (37 T.C. at 162):

The lengthy hearings and the various estimates given before the Board of View demonstrate the lack of definiteness of petitioner's right to recover the amounts of its moving expenses, as such, even though there did exist from the time its property was condemned a general right to recover damages caused by the condemnation, including, of course, some amount of damages because of its being required to move its machinery and equipment.

In the instant case, petitioner had far more than a general right of recovery—it had a written authorization from the

agency to incur certain specified moving costs. There were no hearings or subsequent disputes as to the amount to be recovered, and petitioner received in due course almost the exact amount of the authorized payment.[3] Thus, we find petitioner's reliance on *Electric Tachometer Corp. v. Commissioner, supra,* misplaced.

### Issue 2. Whether Petitioner and Pam-Pak Constitute a "Brother-Sister Controlled Group"

In his notice of deficiency, respondent determined that during each year at issue petitioner and Pam-Pak were a "brother-sister controlled group" within the meaning of section 1563(a)(2). Accordingly, he disallowed, in whole or in part, a claimed surtax exemption under section 11(d), an additional depreciation deduction under section 179, and an investment credit under section 38.[4] There is no dispute as to the propriety of these adjustments if, in fact, petitioner and Pam-Pak fall within the statutory scheme of section 1563(a)(2).

During the years at issue, the shares of petitioner's and Pam-Pak's stock were owned by the following individuals in the following proportions:

|  | Petitioner | Pam-Pak |
| --- | --- | --- |
| Charles Baloian | 33⅓% | 26% |
| Edward Baloian | 33⅓% | 26% |
| James Baloian | 33⅓% | 26% |
| Milton Torigian | 0 | 22% |

Section 1561 places limitations on certain multiple tax benefits for members of a controlled group of corporations, and section 1563(a)(2) defines one such controlled group as follows:

---

[3] The fact that the actual payment ($17,120) differs slightly from the authorized amount ($16,967) does not affect our holding herein; in fact, the closeness of these two figures militates in its favor. See *Burnett v. Commissioner,* 356 F.2d 755 (5th Cir. 1966); *Hearn v. Commissioner,* 36 T.C. 672 (1961).

[4] On brief, respondent concedes that he erroneously denied petitioner's entire investment credit instead of apportioning such credit between the two corporations as required by sec. 48(c)(2)(C) and states that this error will be corrected under the Rule 155 computation.

(2) BROTHER-SISTER CONTROLLED GROUP.—Two or more corporations if 5 or fewer persons who are individuals, estates, or trusts own (within the meaning of subsection (d)(2)) stock possessing—

(A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and

(B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.

This section sets forth two separate tests, an 80-percent test and a 50-percent test, both of which must be met before two or more corporations can be considered to be a brother-sister controlled group. The parties agree that the pattern of stock ownership in the instant case satisfies the 50-percent test. The controversy centers around the 80-percent test and, specifically, whether, for purposes of this test, Torigian's stock ownership in Pam-Pak can be taken into account given the fact that he did not own stock in both Pam-Pak and petitioner.

Respondent, relying on section 1.1563–1(a)(3),[5] Income Tax Regs., contends that common ownership is not required and that Torigian's stock ownership in Pam-Pak can and should be counted. He argues that the computation of the 80 percent should be as follows:

|  | Petitioner | Pam-Pak |
| --- | --- | --- |
| Charles Baloian | 33⅓% | 26% |
| Edward Baloian | 33⅓% | 26% |
| James Baloian | 33⅓% | 26% |

---

[5] (3) Brother-sister controlled group.—(i) The term "brother-sister controlled group" means two or more corporations if the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of the rules contained in paragraph (b) of section 1.1563–3), singly or in combination, stock possessing—

(a) At least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation; and

(b) More than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.

[Emphasis supplied.]

| | | |
|---|---|---|
| Milton Torigian | 0 | 22% |
| | 100% | 100% |

Petitioner, on the other hand, relies on our recent decision in *Fairfax Auto Parts of No. Va., Inc. v. Commissioner*, 65 T.C. 798 (1976), revd. 548 F.2d 501 (4th Cir. 1977), for the proposition that Torigian's ownership in Pam-Pak cannot be taken into account for purposes of the 80-percent test because Torigian did not own stock in both petitioner and Pam-Pak. Thus, petitioner argues that the 80-percent test was not satisfied, as illustrated by the following computation:

| | *Petitioner* | *Pam-Pak* |
|---|---|---|
| Charles Baloian | 33⅓% | 26% |
| Edward Baloian | 33⅓% | 26% |
| James Baloian | 33⅓% | 26% |
| Milton Torigian | 0 | 0 |
| | 100% | 78% |

We hold for petitioner. We fully recognize that section 1.1563–1(a)(3), Income Tax Regs., dictates a holding in favor of respondent; however, in a reviewed opinion, *Fairfax Auto Parts of No. Va., Inc. v. Commissioner, supra,* we held this regulation to be "plainly inconsistent with the thrust of the statutory language" (65 T.C. at 803) and, therefore, to be invalid. Respondent recognizes that the holding and effect of that case is directly contrary to his asserted position herein, but asks that we reconsider and overrule our prior holding.

Respondent's substantive arguments on this issue are in large part drawn from the views expressed by the dissenting opinion filed in *Fairfax Auto Parts of No. Va., Inc. v. Commissioner, supra.* We had the benefit of these views and arguments during our initial consideration of that case, and we do not find them to be any more persuasive today than we did at that time. Notwithstanding the Fourth Circuit's disagreement with our position on this question, we remain convinced of its correctness.

*Decision will be entered under Rule 155.*

Reviewed by the Court.

SIMPSON, *J.,* dissenting: I regret to see that a majority of my colleagues still have not been convinced by the views which I

set forth in the *Fairfax Auto Parts* case (65 T.C. at 807–813), nor by the fact that such views were found persuasive by the Court of Appeals for the Fourth Circuit (548 F.2d 501 (1977), revg. per curiam 65 T.C. 798 (1976)). Here, I merely reiterate that a careful reading of the statute and legislative history reveals no genuine ambiguity in the legislative purpose— Congress meant to require common ownership only for purposes of the 50-percent test and not for purposes of the 80-percent test. A proper appreciation of section 1561 requires a consideration of previous attempts to limit the surtax exemptions in the case of multiple corporations, and when so considered, one can easily recognize that Congress turned to a mechanical test after its dissatisfaction with the results achieved by the subjective tests of sections 269 and 1551. It is not our province to pass upon the wisdom of such an approach. So long as the legislative purpose is manifested, and the regulations are not arbitrary, it is our responsibility to accept and apply them.

RAUM, TANNENWALD, QUEALY, AND WILBUR, *JJ.*, agree with this dissent.