**VOGEL FERTILIZER COMPANY**

v.

**The UNITED STATES.**

**No. 69–78.**

United States Court of Claims.

Aug. 13, 1980.

Ronald C. Jensen, Omaha, Neb., for plaintiff; Kent O. Littlejohn, Omaha, Neb., attorney of record; Baird, Holm, McEachen, Pedersen, Hamann & Haggart, Omaha, Neb., of counsel.

Mary M. Abate, Washington, D. C., with whom was Asst. Atty. Gen. M. Carr Ferguson, Washington, D. C., for defendant; Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and BENNETT and SMITH, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

The issue in this case is the validity of Treas.Reg. § 1.1563–1(a)(3) (1972), which defines the term "brother–sister controlled group" for the purposes of the limited surtax exemption available to multiple corporations. Plaintiff has filed suit for the refund of income taxes for the taxable years ended November 30, 1973, 1974, and 1975. The case is now before the court on the parties' cross–motions for summary judgment. We hold that the regulation is an overly expansive interpretation of I.R.C. § 1563(a)(2) and that plaintiff is not a member of a "brother–sister controlled group" as that term is used in the statute. Therefore, we grant plaintiff's motion for summary judgment.

Plaintiff, Vogel Fertilizer Company, is an Iowa corporation in the business of selling farm fertilizer products at retail to local customers. Plaintiff has only common stock issued and outstanding, and for all relevant periods, Arthur Vogel held 113,575 shares (77.49 percent) and Richard Crain held 33,000 shares (22.51 percent) of such stock.

Vogel Popcorn Company (hereinafter Vogel Popcorn) is also an Iowa corporation, which is engaged in a business unrelated to

plaintiff's. For all relevant periods, Vogel Popcorn had issued and outstanding 440,062 shares of common stock, all of which was held by Arthur Vogel, and 62,866 shares of voting preferred stock, all of which was held by Arthur Vogel as trustee of the Alex Vogel Family Trust. The relative value and voting power of this stock were as follows:

| Shareholder | No. of Shares | Voting % of All Classes Entitled to Vote | Percent of Value of All Classes of Stock | | |
|---|---|---|---|---|---|
| | | | 1973 | 1974 | 1975 |
| Arthur Vogel, individually | 440,062 Common Stock | 87.5 | 90.66 | 91.42 | 93.42 |
| Arthur Vogel, as trustee | 62,866 Voting Preferred Stock | 12.5 | 9.34 | 8.58 | 6.58 |

Richard Crain is not related to Arthur Vogel in any manner. Defendant makes no contention that the stock owned by either person may be attributed under I.R.C. § 1563(d) to the other. Moreover, defendant has expressly conceded that under the attribution rules Arthur Vogel could not be considered the constructive owner of the shares held by him as trustee.

Plaintiff timely filed corporate income tax returns for the years in question. In accordance with Treas.Reg. § 1.1563–1(a)(3), plaintiff originally treated itself and Vogel Popcorn as members of a controlled group of corporations. Plaintiff therefore did not claim the full surtax exemption provided by I.R.C. § 11(d). For the taxable years ended November 30, 1973 and 1974, plaintiff elected to utilize the multiple surtax exemption under I.R.C. §§ 1562 and 1564(a) and to pay the multiple surtax penalty imposed by I.R.C. § 1562(b).[1] For the taxable year ended November 30, 1975, plaintiff elected under I.R.C. § 1561(a)(2)[2] to allocate the single surtax exemption then allowed to members of a controlled group of corporations entirely to Vogel Popcorn.

On November 25, 1976, plaintiff filed timely claims for refund for each of the years in question. Plaintiff asserted that it and Vogel Popcorn were not members of a controlled group of corporations and that, therefore, plaintiff was entitled to a full surtax exemption for each taxable year. After plaintiff's claims were disallowed in full by the Internal Revenue Service, plaintiff timely filed suit in this court.

I

The legal question presented by this case is whether plaintiff and Vogel Popcorn are a "brother–sister controlled group" under section 1563(a)(2). If they are a controlled group, it is undisputed that the limitations imposed by sections 1561 through 1564 would prevent plaintiff from claiming a full surtax exemption.

Section 1563(a)(2) provides that the term "controlled group of corporations" includes:

(2) BROTHER–SISTER CONTROLLED GROUP–Two or more corporations if 5 or fewer persons who are individuals, estates, or trusts own (within the meaning of subsection (d)(2)) stock possessing–

(A) at least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation, and

(B) more than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.

Treas.Reg. § 1.1563–1(a)(3) explains the statute as follows:

(3) *Brother–sister controlled group.* (i) The term "brother–sister controlled

---

1. During these years the benefits of multiple surtax exemptions were being gradually phased out. Section 1562 was repealed effective December 31, 1974, by sections 401(a)(2) and (h)(1) of the Tax Reform Act of 1969, Pub.L.No. 91–172, 83 Stat. 600, 604.

2. Section 1561(a) was amended effective December 31, 1974, by sections 401(a)(1) and (h)(1) of the Tax Reform Act of 1969, *supra*, 83 Stat. 599, 604.

group" means two or more corporations if the same five or fewer persons who are individuals, estates, or trusts own (directly and with the application of the rules contained in paragraph (b) of § 1.1563–3), singly or in combination, stock possessing–

(a) At least 80 percent of the total combined voting power of all classes of stock entitled to vote or at least 80 percent of the total value of shares of all classes of the stock of each corporation; and

(b) More than 50 percent of the total combined voting power of all classes of stock entitled to vote or more than 50 percent of the total value of shares of all classes of stock of each corporation, taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation.

(ii) The principles of this subparagraph may be illustrated by the following examples:

*Example (1).* The outstanding stock of corporations P, Q, R, S, and T, which have only one class of stock outstanding, is owned by the following unrelated individuals:

| Individuals | Corporations | | | | | Identical ownership |
|---|---|---|---|---|---|---|
| | P | Q | R | S | T | |
| A | 60% | 60% | 60% | 60% | 100% | 60% |
| B | 40% | | | | | |
| C | | 40% | | | | |
| D | | | 40% | | | |
| E | | | | 40% | | |
| Totals | 100% | 100% | 100% | 100% | 100% | 60% |

Corporations P, Q, R, S, and T are members of a brother–sister controlled group.

\* \* \* \* \* \*

Thus, the regulation for the most part restates the statute. The regulation does, however, add that the stock ownership of the "same" five or fewer persons should be considered "singly or in combination." Example (1) of the regulation illustrates the meaning of this addition. The example indicates that for the purposes of the 80–percent test a person can be considered as one of the five or fewer members of the group of controlling shareholders even though

such person holds stock only in one corporation.

In this case, there is no question that the 50–percent test in section 1563(a)(2)(B) is met. Arthur Vogel held 77.49 percent of the stock of plaintiff and 87.5 percent (in terms of voting power) of the stock of Vogel Popcorn. The stock ownership is taken into account to the extent that it is identical, *i. e.,* 77.49 percent, which is more than the 50 percent required by section 1563(a)(2)(B).

The dispute here involves only the 80–percent test and specifically whether Richard Crain who holds no stock in Vogel Popcorn can be counted as one of the five or fewer persons who hold 80 percent of the stock of each corporation. Plaintiff concedes that if Example (1) of Treas.Reg. § 1.1563–1(a)(3)(ii) is valid, then Richard Crain's stock can be counted toward the required 80 percent. Plaintiff, however, argues that the regulation is unreasonable and clearly inconsistent with the statute. A person must hold some stock in both corporations, plaintiff contends, before his stock in any corporation can be counted in the 80–percent test.

The validity of Treas.Reg. § 1.1563–1(a)(3) has already been extensively litigated. The first case brought under the regulation was *Fairfax Auto Parts of Northern Virginia, Inc. v. Commissioner,* 65 T.C. 798 (1976). The regulation was found to be invalid in a decision reviewed by the full Tax Court with four judges dissenting. The United States Court of Appeals for the Fourth Circuit reversed the Tax Court in a short *per curiam* opinion agreeing with the four dissenting judges. 548 F.2d 501, *cert. denied,* 434 U.S. 904, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). The Tax Court has reaffirmed its majority view in a second court–reviewed decision, *Charles Baloian Co. v. Commissioner,* 68 T.C. 620 (1977), and has continued to apply section 1563(a)(2) without regard to the regulation in several cases. *See, for example, Davidson Chevrolet Co. v. Commissioner,* No. 2619–78, T.C. Memo. 1979–414 (Oct. 2, 1979); *Delta Metalforming Co. v. Commissioner,* 37 T.C.M.

(CCH) 1485 (1978). Two other courts of appeals have subsequently reversed Tax Court decisions and have upheld the regulation. *Allen Oil Co. v. Commissioner*, 614 F.2d 336 (2d Cir. 1980) *rev'g* 38 T.C.M. (CCH) 355 (1979); *T. L. Hunt, Inc. v. Commissioner*, 562 F.2d 532 (8th Cir. 1977) (2–1 opinion), *rev'g* 35 T.C.M. (CCH) 966 (1976). Appeals from the Tax Court are now pending before several circuits.

### II

Although the parties agree on the mechanical operation of the 50–percent test, plaintiff and defendant have very different views on the importance of the 50–percent test relative to the 80–percent test.

In defendant's view, the 80–percent test only measures the closely held nature of the corporations. Thus, if 80 percent of each corporation is held by five or fewer individuals, the 80–percent test is met regardless of whether all of the five or fewer individuals hold stock in only one corporation. Only the 50–percent test measures whether the corporations are in any way related through common stockholders. Under defendant's interpretation, the 80–percent test standing alone has no significance; it only has meaning as one part of a two–pronged test.

Plaintiff believes that defendant's interpretation accords too little scope to the 80–percent test. The 80–percent test, plaintiff argues, is the more important of the two tests, and the proper role of the 50–percent test is subordinate, not superior, to the 80–percent test. Thus, each of the five or fewer persons considered in the 80–percent test must own some stock in both corporations, and the function of the 50–percent

test is to treat corporations as separate entities if the 80 percent is held in such differing proportions with respect to each corporation that the corporations cannot effectively be controlled as one.[3]

### III

The statute itself has been fairly criticized as being open to at least four different constructions. Libin & Abramowitz, *Multiple Corporations: A Surprising Interpretation of Sec. 1563(a)(2) in Temporary Regulations*, 2 Tax Adviser 326, 327–28 (1971). We agree that the correct interpretation of section 1563(a)(2) cannot be resolved solely by reference to the statutory language. Nevertheless we do believe that the statutory construction made by the Tax Court in *Fairfax Auto Parts of Northern Virginia, Inc. v. Commissioner, supra*, 65 T.C. at 802–03, is the most careful and best analysis of the statute to date.[4] There the Tax Court stated:

> The key words of the statute relevant to an analysis of the issue are:
>
> if 5 or fewer persons * * * own * * *
>
> (A) at least 80 percent * * * of each corporation, and
>
> (B) more than 50 percent * * * of each corporation, taking into account the stock ownership of *each such person* only to the extent such stock ownership is identical with respect to each such corporation. [Sec. 1563(a)(2). Emphasis supplied.]

Since the "five or fewer persons" is the conjunctive subject of both the 80–percent test and the 50–percent test, it cannot be gainsaid that both tests must be satisfied by the same ownership group.

---

**3.** The most obvious example is where the stock of one corporation is held 80 percent by A and 20 percent by B while the stock of another corporation is held 20 percent by A and 80 percent by B. The 80–percent test would be met regardless of which interpretation is correct. The 50–percent test would not be met because the holdings are considered only to the extent that they are identical with respect to each corporation, *i. e.*, 20 percent each for A and B for a total of 40 percent. *See* Technical Explanation of Treasury Tax Reform Proposals in *Hearings on the Subject of Tax Reform Be-*

*fore House Comm. on Ways and Means*, 91st Cong., 1st Sess. 5170 (1969). Because each stockholder has a much greater investment in one of the corporations, the interests of the stockholders and the corporations are quite distinct.

**4.** This construction of the statute was first suggested in Thomas, *Brother–Sister Multiple Corporations–The Tax Reform Act of 1969 Reformed by Regulation*, 28 Tax L.Rev. 65, 77–79 (1972).

However, to gain entrance into the ownership group for purposes of the 50–percent test one must possess stock in each corporation involved since an absence of such stock ownership produces an identical stock ownership of zero or, put another way, no stock ownership at all. If ownership of stock in each corporation involved is a precondition to membership in the ownership group for purposes of the 50–percent test, and the ownership groups for the 50–percent test and 80–percent test are one and the same, it follows in our mind that one must own stock in each corporation before his stock can be taken into account for purposes of the 80–percent test.

Furthermore, the language of the 50–percent test comports with this analysis. The words "each such person" appearing therein refer to the "five or fewer persons" constituting the ownership group for purposes of both the 80–percent and 50–percent tests. The import of such usage is that each person—and not just some of the persons—counted for purposes of the 80–percent test must be also counted for purposes of the 50–percent test. To interpret the statutory language as respondent has done in his regulation is plainly inconsistent with the thrust of the statutory language. Hence, we hold that for a person's stock ownership to be taken into account for purposes of the 80–percent test that person must own stock in each member of the brother–sister controlled group. * * *

Defendant takes exception to the Tax Court's analysis and notes that while the 50–percent test specifically provides for "taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation," the 80–percent test contains no such language. Thus, defendant concludes that there is no specific requirement in the 80–percent test that a person own stock in more than one corporation. Defendant further argues that under the Tax Court's interpretation the 50–percent test would serve no function since it would necessarily be satisfied in any situation in which the 80–percent test was met. This argument attempts to blur the important distinction drawn by the Tax Court between the overlapping ownership required by the 80–percent test and the *identical* overlapping ownership required by the 50–percent test.[5] Contrary to defendant's contentions, the Tax Court's interpretation does not import the requirement of identical ownership into the 80–percent test; it merely requires the same persons to be in the group of controlling stockholders used in both tests.

Defendant further relies upon the "last antecedent" doctrine to dispute that the phrase "each such person" in the 50–percent test refers to the "5 or fewer persons" who are the subject of both tests. This doctrine requires that qualifying words, phrases, and clauses in a statute are to be applied to the words or phrase immediately preceding and are not to be construed as extending to and including others more remote. *Azure v.*

---

**5.** The example given in note 3, *supra*, demonstrates a situation where the 80–percent test, but not the 50–percent test, is met.

Defendant further argues that, even assuming *arguendo* that there may be isolated instances in which the 80–percent but not the 50–percent test would be satisfied under the Tax Court's interpretation, in the vast majority of stock ownership patterns, the Tax Court's common ownership requirement for the 80–percent test would come close to eliminating the 50–percent test despite Congress' intent to have two separate tests. As discussed in part II of this opinion, *supra*, regardless of the interpretation chosen, one of the two tests will play a far more significant role than the other.

Based on the legislative history and purpose of section 1563(a)(2) discussed in parts IV and VI of this opinion, *infra*, we have concluded that the 80–percent test was intended to be the primary test and must be so treated if it is to have any significance at all. While we disagree with defendant's unsupported factual assertions with respect to the "vast majority" of stock ownership patterns, we do agree that under our interpretation the 50–percent test by itself would result in the exclusion of a group of corporations from treatment as a brother–sister controlled group only in an atypical stock ownership arrangement. This, in our opinion, is precisely what the 50–percent test was intended to do.

*Morton,* 514 F.2d 897, 900 (9th Cir. 1975); *Quindlen v. Prudential Ins. Co. of America,* 482 F.2d 876, 878 (5th Cir. 1973). Defendant misunderstands the function of this doctrine, which, for example, would establish (in the absence of clarifying indentation) that the qualifying clause "taking into account the stock ownership of each such person only to the extent such stock ownership is identical with respect to each such corporation" only applies to the immediately preceding 50–percent test and not to the more remote 80–percent test. The phrase "5 or fewer persons" is the most immediately preceding reference to "persons" prior to the phrase "each such person." As such, both common English usage and the "last antecedent" doctrine support the Tax Court's interpretation.

Despite the better reasoned construction of the statutory language by the Tax Court, it must be admitted that the different view taken by Treas.Reg. § 1.1563–1(a)(3) is not wholly unreasonable as a construction of the words appearing in section 1563(a)(2). The regulation is, however, clearly inconsistent with the legislative history and unreasonable when the purpose, as well as the bare words, of the statute are considered.

## IV

In order to understand the legislative history of section 1563(a)(2), it is necessary to begin with earlier congressional attempts to deal with the tax abuses of multiple corporations. Prior to the Revenue Act of 1964, Pub.L.No. 88–272, 78 Stat. 19, the Commissioner of Internal Revenue had fairly limited powers to curb multiple incorporation for the purpose of claiming extra surtax exemptions. The only provision of the Internal Revenue Code specifically aimed at multiple surtax exemptions was section 1551.[6] Prior to 1964, section 1551 disallowed the surtax exemption of a transferee corporation in certain cases if the corporation failed to establish by a preponderance of the evidence that the securing of the exemption was not a major purpose of the transfer. Section 1551 applied to situations where a corporation transferred part or all of its property (other than money) to another corporation created to acquire such property, or not actively engaged in business at the time of the transfer, if there was common control of the two corporations.

The Revenue Act of 1964 expanded the Commissioner's power to deal with multiple surtax exemptions in two ways.

First, sections 1561 through 1563 were added to the Code. These new provisions limited in one of three alternative ways the surtax exemptions available to a "controlled group of corporations." Sections 1561–1563 established a mechanical test relating to stock ownership, and once it was met, the sanctions would apply regardless of any legitimate nontax purposes for the use of more than one corporation.[7] A "brother–sister controlled group" was defined in the 1964 Act as existing where a *single* individual, trust, or estate owned at least 80 percent of the total combined voting power or value of all classes of stock of each of two or more corporations.[8] *See* H.Rep.No. 749,

---

**6.** The Commissioner could also employ more general powers under section 269 to disallow tax benefits resulting from the acquisition of control of a corporation where the principal purpose of such acquisition is the evasion or avoidance of federal income tax or under section 482 to reallocate deductions, credits, or allowances between two corporations owned or controlled by the same interest where necessary to prevent the evasion of taxes or clearly to reflect the income of the corporations.

**7.** The mechanical application of sections 1561–1563 is by far the most significant change from the approach taken in section 1551. In Thomas, *Brother–Sister Multiple Corporations–The Tax Reform Act of 1969 Reformed by Regula-*

*tion,* 28 Tax L.Rev. 65, 69 (1972), it is noted that virtually every litigated case under the older section 1551 was decided by a determination of the taxpayer's purpose or motive and that not one case can be found that seriously raised any question as to the control requirements under that statute.

**8.** It is worth noting that in President's 1963 Tax Message in *Hearings on the President's 1963 Tax Message Before the House Comm. on Ways and Means,* 88th Cong., 1st Sess. 77 (1963), the Treasury Department originally proposed to define a brother–sister controlled group less stringently than in Treas.Reg. § 1.1563–1(a)(3) under the 1969 change in sec-

88th Cong., 1st Sess. (1963), *reprinted in* [1964] U.S. Code Cong. & Ad.News, pp. 1313, 1428, 1624, 1964–1 C.B. (Part 2) 125, 243, 446; S.Rep.No. 830, 88th Cong., 2d Sess. (1964), *reprinted in* [1964] U.S.Code Cong. & Ad.News, pp. 1673, 1825, 1964–1 C.B. (Part 2) 505, 655.

Second, section 1551 was retained and expanded in scope. One of the changes was to apply section 1551 to transfers by an individual (as well as a corporation) to a controlled corporation. Under section 1551(b)(2), control was deemed to exist where the individual who made the transfer, together with no more than four individuals, owned at least 80 percent of the value or voting power of the stock in two or more corporations, one of which was the transferee corporation, and where the same individuals owned more than 50 percent of the value or voting power of the stock in each corporation (only taking into account identical stockholdings) after the transfer.

tion 1563(a)(2). Under the proposal, a brother–sister affiliated group would have included any group of two or more corporations if (1) at least 80 percent of the value or voting power of the stock of each of the corporations was owned by not more than five individuals, (2) each of the individuals owned 5 percent or more of the value or voting power of the stock of at least one of the corporations, and (3) each of the individuals owned substantially the same proportion of the voting power or value of the stock of each of the corporations. In determining whether there existed 80–percent common ownership in each of two brother–sister–type corporations in substantially the same proportion, an individual's stock ownership in one corporation would not have been taken into account to the extent it exceeded twice the percentage of his stock ownership in the other corporation.

Thus, it is clear that under the first part of the 1963 proposal an 80–percent overlap of ownership was required. There is no equivalent in the 1969 statute to the second part of the 1963 proposal, but the third part has a very similar function to the 50–percent test in the 1969 statute as construed by plaintiff and this court. Neither one erases the requirement of an 80–percent overlap, and both measure whether the 80 percent is held to a large extent in identical proportions with respect to each corporation.

**9.** The General Explanation in H.Rep.No. 91–413 (Part I), 91st Cong., 1st Sess. 99 (1969), *reprinted in* [1969] U.S.Code Cong. & Ad.News, pp. 1645, 1747–48, 1969–3 C.B. 200, 262, only states:

*See* H.Rep.No. 749, *supra*, [1964] U.S.Code Cong. & Ad.News at 1432, 1638–39, 1964–1 C.B. (Part 2) at 247, 460–61; S.Rep.No. 830, *supra*, [1964] U.S.Code Cong. & Ad.News at 1829, 1964–1 C.B. (Part 2) at 659. There are no reported court decisions under section 1551(b)(2) which construe the meaning of this control test.

In 1969, the Treasury Department made several further proposals relating to multiple corporations. One of these was to expand the definition of a brother–sister controlled group in section 1563(a)(2) to consider the stockholdings of up to five persons instead of only one. The Treasury proposal to modify section 1563(a)(2) to apply the same test as section 1551(b)(2) was adopted without change by the Congress. *See* the Tax Reform Act of 1969, Pub.L.No. 91–172, § 401(c), 83 Stat. 602. Therefore, the committee reports on this aspect of the bill are very cursory.[9] The only significant contem-

"The bill also modifies the present definition of a brother–sister controlled group–i. e., two or more corporations 80 percent or more of the stock of which is owned (by voting power or value) by one individual, estate, or trust. This bill expands this definition to include two or more corporations which are owned 80 percent or more (by voting power or value) by five or fewer persons (individuals, estates, or trusts) provided that these five or fewer persons own more than 50 percent of each corporation when the stock of each person is considered only to the extent it is owned identically with respect to each corporation. In other words, a person who owns 70 percent of one corporation and 30 percent of another corporation is to be treated as owning only 30 percent of each corporation identically. It is only this amount which would be taken into account in applying the 50–percent test."

The Technical Explanation in H.Rep.No. 91–413 (Part II), *supra*, at 76, [1969] U.S.Code Cong. & Ad.News at 1956, 1969–3 C.B. 384, only adds: "Subsection (c) of section 401 of the bill amends section 1563(a)(2) of the code to expand the definition of a brother–sister controlled group of corporations. The stock ownership test would be the same test employed in section 1551(b)(2) of the code."

The relevant portion of S.Rep.No. 91–552, 91st Cong., 1st Sess. 135 (1969), *reprinted in* [1969] U.S.Code Cong. & Ad.News, pp. 2027, 2167, 1969–3 C.B. 423, 510, is substantially the same as the General Explanation in the House Report.

poraneous legislative material on the 1969 change in section 1563(a)(2) is the Treasury Department's explanation of its proposal. The relevant portions of the Technical Explanation and the General Explanation of Treasury Tax Reform Proposals in *Hearings on the Subject of Tax Reform Before House Comm. on Ways and Means*, 91st Cong., 1st Sess. 5168–70, 5394–96 (1969), state:

(b) *Brother–sister controlled group.* Present law defines a brother–sister controlled group as a group of corporations in which the voting stock or value of shares of each member is owned 80 percent by the same person (i. e., individual, estate or trust). Under the proposal, the present definition would be changed so that a group of corporations would constitute a brother–sister controlled group if (1) the same *five* or fewer persons own at least 80 percent of the voting stock or value of shares of each corporation, and (2) these five or fewer individuals own more than 50 percent of the voting power or value of shares of each corporation considering a particular person's stock only to the extent that it is owned identically with respect to each corporation. This definition is the same as that under section 1551 (relating to the disallowance of surtax exemptions and accumulated earning credits in cases of transfers in order to secure the exemption or credit).

Part (1) of this test is satisfied if the group of five or fewer persons as a whole owns at least 80 percent of the voting stock or value of shares of each corporation, regardless of the size of the individual holdings of each person. Thus, for example, part (1) (but not necessarily part (2)) is met whether one person owns 80 percent of the voting stock of each corporation, four persons each own 20 percent of the voting stock of each corporation, or one person owns 60 percent of the voting stock of one corporation and 40 percent of another, and another person owns 40 percent of the voting stock of the first and 60 percent of the second.

Part (2) of the test is satisfied only if the same five or fewer persons own more than 50 percent of the voting stock or value of shares of each corporation, considering stock owned by a particular person only to the extent that it is owned identically in each of the corporations. Thus, for example, a person who owns 80 percent of the voting stock of one corporation and 30 percent of another would be considered as owning 30 percent of both corporations for purposes of part (2) of the test.

The following two examples illustrate the operation of this two–part test:

Example 1

| | Percent of Stock Ownership (pt. 1) | | Percent of Identical Ownership (pt. 2) | |
|---|---|---|---|---|
| | Corp. No. 1 | Corp. No. 2 | Corp. No. 1 | Corp. No. 2 |
| Shareholders: | | | | |
| A | 30 | 75 | 30 | 30 |
| B | 70 | 25 | 25 | 25 |
| Total | 100 | 100 | 55 | 55 |

Example 2

| | Percent of Stock Ownership (pt. 1) | | Percent of Identical Ownership (pt. 2) | |
|---|---|---|---|---|
| | Corp. No. 1 | Corp. No. 2 | Corp. No. 1 | Corp. No. 2 |
| Shareholders: | | | | |
| A | 80 | 20 | 20 | 20 |
| B | 20 | 80 | 20 | 20 |
| Total | 100 | 100 | 40 | 40 |

In both examples, individuals A and B together own 100 percent of both corporations. Thus, part (1) of the test is met. However, under part (2) of the test, the stock holdings of A and B are restricted to the lowest percentage of any member to be included in the group. Thus, in Example 1, because stockholder A owns only 30 percent of Corporation No. 1 he is considered to own only 30 percent of Corporation No. 2. Part (2) of the test is satisfied in Example 1, but not in Example 2. Consequently, the corporations in Example 1 would constitute a brother–sister controlled group while those in Example 2 would not.

\*     \*     \*     \*     \*     \*

(2) *Brother–sister groups.*–A group of corporations in which five or fewer per-

sons [10a] own, to a large extent in identical

[10a] "Persons" in this discussion refers to individuals, estates, or trusts.

proportions, at least 80 percent of the stock of each of the corporations. This provision expands present law by considering the combined stock ownership of five individuals, rather than one individual, in applying the 80–percent test. Even the mild 6–percent penalty under existing law for brother–sister corporations claiming multiple surtax exemptions is largely ineffectual because of the present requirement that one person own 80 percent of the stock of each corporation before the group of corporations is subject to the penalty.

However, in order to insure that this expanded definition of brother–sister controlled group applies only to those cases where the five or fewer individuals hold their 80 percent in a way which allows them to operate the corporations as one economic entity, the proposal would add an additional rule that the ownership of the five or fewer individuals must constitute more than 50 percent of the stock of each corporation considering, in this test of ownership, stock of a particular person only to the extent that it is owned identically with respect to each corporation.

Thus, even where the 80 percent ownership test is met, the brother–sister definition will not apply unless the stockholdings of the individuals in the various corporations also meet the 50–percent identical ownership test.

For example, if A owns 55 percent of Corporation Y and 45 percent of Corporation Z, and B owns 35 percent of Y and 40 percent of Z, the two tests would apply as follows:

| Shareholder: | Percent of stock ownership | | Percent of identical ownership | |
|---|---|---|---|---|
| | Corporation | | Corporation | |
| | Y | Z | Y | Z |
| A | 55 | 45 | 45 | 45 |
| B | 35 | 40 | 35 | 35 |
| Total | 90 | 85 | 80 | 80 |

As the table illustrates, A and B together own 90 percent of Y and 85 percent of Z. Thus, the basic 80 percent ownership test is met. However, since A owns 55 percent of Y but only 45 percent of Z, his stockholdings in the two are identical only to the extent of 45 percent. Similarly, B's stockholdings are identical only to the extent of 35 percent. Together A and B hold 80 percent each of Y and Z and the 50–percent test is met. Thus, in this example, Y and Z are members of a brother–sister controlled group.

Expanding the 80–percent ownership test from one person to five will close the present opportunity for easy avoidance of that 80–percent test. However, adding the 50–percent identical ownership test will insure that the new expanded definition is limited to cases, where the brother–sister corporations are in fact, controlled by the group of stockholders as one economic enterprise.

After having read the entire Treasury explanation, we fail to understand how this document has been construed as supporting, or at least not contradicting, the interpretation of section 1563(a)(2) made by Treas. Reg. § 1.1563–1(a)(3). Nevertheless, various courts have construed it in this manner.[10] Therefore, we will discuss in detail how the Treasury explanation clearly indicates that each of the five or fewer persons considered under the 80–percent test must hold some stock in each corporation in the controlled group.

First, and foremost, the Treasury explanation directly states this very proposition:

* * * Under the proposal, the present definition would be changed so that a group of corporations would constitute a brother–sister controlled group if (1) the *same five* or fewer persons own at least 80 percent of the voting stock or value of shares of *each* corporation, and (2) *these* five or fewer individuals own more than 50 percent of the voting power or value

**10.** *See Allen Oil Co. v. Commissioner, supra,* 614 F.2d at 339; *T. L. Hunt, Inc. v. Commissioner, supra,* 562 F.2d at 535; *Fairfax Auto* *Parts of Northern Virginia, Inc. v. Commissioner, supra,* 65 T.C. at 809–10 (dissenting opinion), 548 F.2d at 503.

507

of shares of *each* corporation considering a particular person's stock only to the extent that it is owned identically with respect to each corporation. [Emphasis added in part.]

The use of the word "same" in the above sentence removes any possible ambiguity and establishes that the same persons must own some stock in each corporation. Moreover, the use of the words "these five or fewer individuals" supports the construction of the statute by the Tax Court in *Fairfax Auto Parts* to the effect that the same persons, with no additions or subtractions, must be considered in both the 80–percent and the 50–percent tests.[11]

Second, if the regulation's interpretation of section 1563(a)(2) is correct, the most significant change made to that section is not the expansion of the number of stockholders considered from one to five but rather the removal of the requirement in the prior version of the 80–percent test that each stockholder must own some stock in each corporation. In effect, the amended section as interpreted by the regulation would reduce the required overlap of ownership from 80 to 50 percent. Yet, the Treasury explanation says only that present law is expanded "by considering the combined stock ownership of five individuals, rather than one individual, in applying the 80–percent test." To paraphrase Judge Webster's dissent in *T. L. Hunt, Inc. v. Commissioner, supra,* 562 F.2d at 537, the prior version of the 80–percent test required both sameness and smallness. The Treasury explanation indicates that the number constituting smallness would be increased, but there is absolutely no indication that the requirement of sameness would be removed.

Moreover, if the Treasury was indeed proposing to remove the requirement of sameness in the 80–percent test, it is scarcely credible that an example to illustrate this important change would not have been given. In every example in the Treasury explanation involving the 80–percent test, the persons mentioned own some stock in each corporation.[12] The explanation even states in detail that the 80–percent test is met "whether one person owns 80 percent of the voting stock of each corporation, four persons *each* own 20 percent of the voting stock of *each* corporation, or one person owns 60 percent of the voting stock of one corporation *and 40 percent of another,* and another person owns 40 percent of the voting stock of the first *and 60 percent of the second.*" [Emphasis supplied.]

Third, the Treasury explanation indicates in several ways that the 80–percent test was envisioned as a test of independent significance, in fact a test of greater significance than the 50–percent test. The explanation states in two places that the 50–percent test is added to "insure" that the corporations are in fact "controlled" by the group of stockholders as one economic entity or enterprise. The use of the word "insure" indicates that the 80–percent test also measures to some degree whether the corporations can be considered one economic entity. The 80–percent test therefore must measure substantial overlapping financial interests. The 50–percent test was added to "insure," not to establish, the unity of economic enterprise by measuring whether overlapping control exists.

Similarly, the explanation states: "Thus, even where the 80 percent ownership test is met, the brother–sister definition will not apply unless the stockholdings of the individuals in the various corporations also meet the 50–percent identical ownership test." The emphasis of the sentence on the

11. Similar language is also found in H.Rep.No. 91–413 and S.Rep.No. 91–552, *supra* note 9, with respect to the amendment of section 1563(a)(2) and in H.Rep.No. 749 and S.Rep.No. 830, *supra*, with respect to the enactment of section 1551(b)(2).

12. No examples are provided in the committee reports on the amendment of section 1563(a)(2). However, the example in the House committee report on the original enactment of the same statutory language as section 1551(b)(2) involves persons who own stock in each corporation. H.Rep.No. 749, *supra*, [1964] U.S.Code Cong. & Ad.News at 1638–39, 1964–1 C.B. (Part 2) at 460–61.

80–percent test as the primary requirement belies the notion that the 80–percent test was intended to measure only the number of stockholders and not the extent of overlapping stock ownership. The Treasury explanation is totally inconsistent with the relatively minor role relegated to the 80–percent test by Treas.Reg. § 1.1563–1(a)(3).

In conclusion, we find no ambiguity whatsoever in the Treasury explanation and other legislative material when they are read in their entirety. It would be a gross usurpation of the power of Congress to draft tax statutes to allow the Treasury to explain a legislative proposal in one way and then to interpret it after enactment in a far more expansive fashion. Since it was understood at all times during the legislative consideration of the Tax Reform Act of 1969 that the proposal would track the language of section 1551(b)(2), there can be no doubt that Congress was enacting precisely what it understood the Treasury to be proposing.

V

Defendant relies upon two similar arguments to support its interpretation of section 1563(a)(2). First, since section 1563(a)(2) of the Code (section 401(c) of the Tax Reform Act of 1969, *supra*) contains language identical to the previously enacted section 1551(b)(2), Congress must have intended to adopt the interpretation of this language made in Treas.Reg. § 1.1551–1 (1967). Second, the Employee Retirement Income Security Act of 1974 (ERISA), Pub.L. No. 93–406, §§ 1013(c)(1) and 1015, 88 Stat. 921, 925, incorporated section 1563(a) by reference in sections 404(a)(1)(C) and 414(b) of the Internal Revenue Code at a time when Treas.Reg. § 1.1563–1(a)(3) had already been published. Therefore, defendant argues that Congress necessarily approved the interpretation of section 1563(a)(2) made by the regulation.

While it is clear that Congress intended the same statutory tests to be applied in all of the above instances, there is no indication in the legislative history of either the Tax Reform Act of 1969 or ERISA that Congress was aware of or approved any regulation interpreting the control requirements for brother–sister corporations. According to 1 Mertens' Law of Federal Income Taxation ¶ 3.24 (1974 rev. ed.), the rule relating to implied congressional approval of an administrative construction through statutory reenactment is an anachronism left over from earlier days in which statutes were briefer, were seldom reenacted or amended, and where administrative interpretation was far simpler. Reenactment–particularly without the slightest affirmative indication that Congress ever had before it the particular construction in question–is an unreliable indicium at best. *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955).

In addition to the general unreliability of the doctrine of statutory reenactment, the doctrine has been found particularly inappropriate where the prior construction is not of long standing. In *United States v. Calamaro*, 354 U.S. 351, 358–59, 77 S.Ct. 1138, 1143–44, 1 L.Ed.2d 1394 (1957), the Supreme Court refused to give any significance to the reenactment of a provision as a part of the 1954 Code only 3 years after the issuance of the regulation in question. *Accord, Commissioner v. Sun Pipe Line Co.*, 126 F.2d 888, 892 (3d Cir. 1942); *Commissioner v. F.H.E. Oil Co.*, 102 F.2d 596, 598 (5th Cir. 1939), *aff'd*, 308 U.S. 104, 60 S.Ct. 26, 84 L.Ed. 109 (1939); *see also Eastman Kodak Co. v. United States*, 99 Ct.Cl. 569, 572, 48 F.Supp. 357, 359 (1943). Because of the short periods between the publication of each regulation and the enactment of the subsequent statute (22 months in the case of the regulations under section 1551(b)(2) and 29 months in the case of Treas.Reg. § 1.1563–1(a)(3)), congressional approval of the regulations cannot be implied.

Finally, defendant's first argument must also be rejected because the regulations under section 1551(b)(2) did not unambiguously establish the interpretation which, according to defendant, Congress approved. Any implied congressional approval must necessarily be limited to the literal wording

of the regulations and cannot be extended to a possible inference or interpretation. *Montana Power Co. v. United States*, 232 F.2d 541, 549 (3d Cir.), *cert. denied*, 352 U.S. 843, 77 S.Ct. 51, 1 L.Ed.2d 59 (1956). In drafting Treas.Reg. § 1.1551–1, the Treasury did not add the words "singly or in combination" to the statutory language as it did to the same language in Treas.Reg. § 1.1563–1(a)(3). Furthermore, the Treasury did not provide an explicit example such as Treas.Reg. § 1.1563–1(a)(3)(ii), Example (1), to show that persons owning stock in only one corporation can be counted in the 80–percent test. The examples provided in Treas.Reg. § 1.1551–1 are capable of more than one interpretation.

One example, Treas.Reg. § 1.1551–1(f)(2), Example (2), involves individual A who owns all of the stock of corporation X. Individual A transfers property to corporation Y in exchange for 60 percent of the voting stock of Y. During a later taxable year of Y, A acquires an additional 20 percent of Y's voting stock. The example concludes that section 1551(a)(3) is applicable *beginning in the taxable year in which the later acquisition of stock occurred.* The inapplicability of section 1551(a)(3) to the earlier taxable years can only be explained in one of two ways. First, the Treasury then considered that the 80–percent test would only apply to persons who owned stock in both X and Y. Alternatively, the 40 percent of Y's stock not owned previously by A could have been so diversly held that no four other stockholders would own as much as 20 percent. This alternative explanation is unlikely because it assumes that the drafters of the regulation committed a cardinal error in writing an example by failing to provide all of the facts necessary to understand the example.

Another example, Treas.Reg. § 1.1551–1(g)(4), Example (4), on which defendant relies, may indicate a contrary proposition. In this example, individual A owns 55 percent of the stock of corporation X. Another 25 percent of the stock of X is owned in the aggregate by individuals B, C, D, and E. Individual A transfers property to corporation Y in exchange for 60 percent of the stock of Y, and B, C, and D acquire all of the remaining stock of Y. The example concludes, without providing any rationale, that the transfer is within the scope of section 1551(a)(3). Defendant argues that the example demonstrates that owning stock in both corporations is not a requirement of the 80–percent test. However, the examples under paragraph (g) of Treas.Reg. § 1.1551–1 are intended as illustrations of the nature of the transfer required under that paragraph rather than as illustrations of the meaning and application of the term "control" discussed in paragraph (e). It has been suggested that the example merely illustrates that a transfer can be made by one, rather than all, of the individuals in control of the transferor corporation or that the controlling stockholders of the transferee corporation must come from the group of five or fewer stockholders of the transferor but need not include all of the members of that group. Bonovitz, *Brother–Sister Controlled Groups under Section 1563: The 80 Percent Ownership Test*, 28 Tax Lawyer 511, 524–28 (1975). These suggested constructions of the example would not conflict with our interpretation of section 1563(a)(2) and are just as likely to be the proper construction of an ambiguous example as that of defendant's.

Thus, we hold that no definite conclusions with respect to the proper interpretation of section 1563(a)(2) can be drawn from the regulations under section 1551(b)(2) or from the later enactment of ERISA.

## VI

In addition to concluding that Treas.Reg. § 1.1563–1(a)(3) is inconsistent with Congress' intent as evidenced by the legislative history, we have further determined that the regulation is an unreasonable interpretation of the statute. Under the regulation, the 80–percent test measures nothing of significance when the purpose of the statute is considered.

The purpose of the tests in section 1563(a)(2) is to measure whether there is such a substantial identity between the

stockholdings of two or more corporations to warrant treating them as one entity limited to one surtax exemption.[13] The percentage of overlapping stockholdings that constitutes such a substantial identity is necessarily a somewhat arbitrary figure.[14] Congress could, if it wished to do so, set the minimum percentage of overlap at 50 percent, but if it did, it would not have included a superfluous 80–percent test. As Judge Webster states in his dissenting opinion in *T. L. Hunt, Inc. v. Commissioner, supra,* 562 F.2d at 537:

> * * * There is nothing ·in the legislative history to suggest that Congress intended to penalize companies in which there were five or fewer shareholders. It is not the *smallness* of the number of persons in each company that triggers § 1563; it is the *sameness* of that small number. The 80 per cent financial interest requirement is meaningless unless it is the *same* group of five or fewer persons that own 80 per cent of each company within the controlled group. It is this requirement of "economic entity" which is entirely eviscerated by Reg. § 1.1563–1(a)(3). [Emphasis in original.]

Furthermore, section 1563(a)(1) provides persuasive evidence that Congress would require a significantly greater overlap of stockholdings than 50 percent before it would treat two or more corporations as one entity. Section 1563(a)(1) defines a "parent–subsidiary controlled group" as existing where a parent corporation owns stock representing 80 percent of the value or voting power of one or more subsidiary corporations either directly or indirectly through a subsidiary. It seems highly unlikely that Congress would require a lesser identity of ownership between brother–sister corporations owned by up to five persons than between a more centralized and more easily controlled parent–subsidiary group.

The Second Circuit in *Allen Oil Co. v. Commissioner, supra,* 614 F.2d at 340, has offered the following explanation of the 80–percent test as interpreted by Treas. Reg. § 1.1563–1(a)(3):

> * * * According to the Commissioner, the 80% test is designed to assure that within the group of five persons or fewer the overall control of or financial interest in each of the corporations will beyond question be substantially more than 50% (i. e., 80%), * * *
>
> * * * it [the 80–percent test as interpreted by the Commissioner] insures that the stock is closely held. Thus, even though five or fewer persons may satisfy the 50% control test, the tax exemption of a corporate member of the group is saved only if shareholders who are not part of the group of five or fewer own more than 20% of its stock.

The majority opinion in *T. L. Hunt, Inc. v. Commissioner, supra,* 562 F.2d at 536 n. 2, similarly states:

> * * * The 80 per cent test prevents the denial of surtax exemptions in situations meeting the 50 per cent control test if five or fewer persons do not meet the 80

---

13. The same tests of control also affect the amounts allowed in computing the accumulated earnings credit under section 535(c)(2) and (3) of the Code and the limitation on the small business deduction of life insurance companies under sections 804(a)(3) and 809(d)(10). *See* section 1561(a)(2) and (3). As discussed in part V of this opinion, *supra,* the same definition of the term "controlled group" is adopted with respect to pension and profit–sharing plans in sections 404(a)(1)(C) and 414(b) of the Code by ERISA. Other cross–references in the Code to section 1563(a) are found in section 46(a)(6) relating to the $25,000 refund limitation on the investment tax credit, in section 58(b) relating to the $10,000 exemption from the minimum tax on preference items, and in section 179(d)(6) relating to the $10,000 limita-

tion on additional first–year depreciation for small business.

14. Thus, even if one person owns 100 percent of the stock of one corporation and 79.9 percent of the stock of a second ·corporation, the two corporations would not be a controlled group. While this may seem to some to permit abusive situations, it is unquestionably Congress' prerogative to choose the determinative percentage, and in this case, it has chosen 80 percent. It is certainly no more arbitrary to classify these two corporations as not constituting a controlled group than it would be to hold under the regulation that they were a controlled group even if the stock held in the second corporation were only 50.1 percent.

per cent financial interest test. The 80 per cent test thus serves the purpose of saving the tax exemption in situations where minority stockholders own a substantial amount of the stock.

These explanations are only a restatement of the obvious implications of defendant's interpretation of the 80–percent test. Indeed, it does measure whether 80 percent of the stock of each corporation is closely held and conversely whether many small stockholders together own a substantial amount of stock, but no explanation is offered why these facts have any significance to the question of whether the corporations are "one economic entity." No one has provided any rationale for including in the number of stockholders counted in the 80–percent test those stockholders who only own stock in one of the corporations.

We do not believe that any reasonable purpose is served by counting such persons. For example, suppose that individual A owns 100 percent of the stock of corporation X and 60 percent of the stock of corporation Y, that individuals B, C, D, and E (first group) each own 5 percent of the stock of Y for a total of 20 percent, and that individuals F, G, H, I, and J (second group) each own 4 percent of the stock of Y for a total of 20 percent. Individual A owns in excess of 50 percent of each corporation and therefore has undisputed voting control of both. While we would hold that the 80–percent test was not met, defendant would maintain that it would be met because the stock of the first group could be added to A's stock. We disagree because the members of the first group have nothing in common with A which could logically cause them to be included with A in a group of controlling stockholders for the purpose of limiting the surtax exemptions of X and Y. The interests of the first group are virtually identical to those of the second group. They will suffer the same as the second group if Y's surtax exemption is lost, and since they do not hold stock in X, they will have done nothing more than the second group to trigger such treatment of Y except for the ownership of slightly more stock in Y.

While the above example represents an extreme case clearly demonstrating the unreasonableness of defendant's position, we believe that the same principles would hold true if B owned 24 percent of the stock of Y and stockholders C through J each owned 2 percent for a total of 16 percent. B would still have more in common with the 2–percent stockholders than with A. B would be just as much a "minority stockholder" as they are.[15]

Finally, defendant points out that if Richard Crain held as much as one share of stock in Vogel Popcorn, then section 1563(a)(2) would apply even under our interpretation. Defendant contends that had Congress intended to require common ownership as part of the 80–percent test, it would have provided for some minimum and meaningful level thereof and would not have left it to turn upon the happenstance of a symbolic but factually meaningless ownership of a single share. Defendant's argument may seem valid in the abstract

15. The dissent suggests that the purpose of the 80–percent test under the position taken by the regulation is to insure that the stockholders with overlapping 50–percent control of both corporations can obtain 66⅔–percent or 75–percent voting control when necessary without experiencing the difficulty and attendant delay of dealing with a large number of other stockholders. There is absolutely nothing in the legislative history to suggest that the 80–percent test was intended to measure control. For the most part, the operation of two or more corporations as one economic entity can be secured by mere 50–percent control. In enacting the 80–percent test, Congress obviously had in mind something other than control.

Eighty–percent ownership was made relevant as a test of a substantial *identity* of financial interest between the two corporations.

Moreover, assuming *arguendo* that the 80–percent test is a "control" test, control would be relevant only to the extent that it would allow the two or more corporations to be operated as one entity. The stockholders with overlapping 50–percent control of both corporations would not be able to secure the agreement of a stockholder in only one of the corporations to a proposal that would be disadvantageous to his corporation. It is not "control" if the majority stockholders have to negotiate with, and make concessions to, the minority stockholders in order to pass a proposal.

but it has no merit when the predictable actions of real taxpayers are considered. It might well be appropriate not to consider the ownership of a token amount of stock if taxes could be *avoided* by such ownership. Here the ownership of a token amount of stock would *increase* taxes, and Richard Crain would be most ill advised to acquire one share of stock in Vogel Popcorn and so cause the 80–percent test to be satisfied. Presumably, Mr. Crain is aware of the tax laws and would only acquire stock in Vogel Popcorn if he wished to make an investment of sufficient magnitude to compensate for the loss of a surtax exemption.

## VII

■ Normally courts are reluctant to invalidate a Treasury Regulation and will do so only if the regulation clearly constitutes an impermissible expansion or contraction of the provision of the Internal Revenue Code that it interprets and applies. The courts recognize the broad discretion of the Commissioner by regulation to give detailed content to, fill in the details of, and explain and define the various provisions of, the Code. *See, e. g., Bingler v. Johnson*, 394 U.S. 741, 749–50, 89 S.Ct. 1439, 1444–45, 22 L.Ed.2d 695 (1969); *United States v. Correll*, 389 U.S. 299, 305–06, 88 S.Ct. 445, 448–49, 19 L.Ed.2d 537 (1967). If the meaning or application of the Code provision is unclear, the regulation ordinarily carries the day.

The present case, however, is inappropriate for the application of that principle, upon which the dissenting opinion in the Tax Court in *Fairfax* placed great weight. 65 T.C. at 807–08. The sole question here is whether the 80–percent provision requires that the five or fewer persons involved each hold stock in all of the brother–sister corporations. The answer to that question turns upon the statutory language, the legislative history, and the basic purpose and design of the legislation.

■ If section 1563(a)(2)(B) applies only when each of the stockholders holds stock in each of the corporations, then the regulation is invalid as an impermissible alteration of the statute. If, on the other hand, the 80–percent provision applies even where each of the persons does not hold stock in each of the corporations, that conclusion flows from the statute itself, without regard to the regulation. In this case, therefore, the regulation either adds nothing not already in the statute or is inconsistent with the statute. Accordingly, the regulation here is not entitled to the significance we otherwise would give it.

## CONCLUSION

■ Accordingly, we hold Treas.Reg. § 1.1563–1(a)(3) invalid to the extent that it counts stock held by a shareholder in only one corporation of the group of corporations toward the 80–percent requirement in section 1563(a)(2)(A). Plaintiff's cross–motion for summary judgment is granted, and defendant's motion for summary judgment is denied. The case is remanded to the trial division for a determination under Rule 131(c) of the amount of plaintiff's recovery.

FRIEDMAN, Chief Judge, concurring:

Although I fully agree with everything in the court's opinion, I add the following comments:

As noted, in the 1964 statute a "brother–sister controlled group" was defined as two or more corporations in which a single individual owned 80 percent or more of the stock. Under that definition no question could arise whether the same individual had to be a stockholder in all of the brother–sister controlled corporations.

When Congress in 1969 expanded the definition of brother–sister controlled corporations to cover situations where up to five people owned 80 percent of the stock, it is reasonable to assume that it intended to build on the previous law, changing only the number of persons whose stock interests would be considered and not the nature of those interests. If, when Congress broadened the number of persons from one to five, it also intended to make the definition applicable even where not all of those additional stockholders held interests in all of the corporations, presumably it would have

explicitly so indicated—either in the language of the statute or in its legislative history. It did neither. Not only does the legislative history fail so to indicate, but, as shown, whatever history there is on this issue points in the opposite direction.

The defendant argues, however, that in the 50–percent provision Congress has manifested its intention to change the character of the interlocking interests. The argument is that since only the latter provision contains language specifically recognizing that the five or fewer stockholders must have stock in all of the companies, the implication is that the 80–percent provision, which does not contain similar language, does not include that requirement.

The language of the 50–percent provision upon which the defendant relies, however, does not justify that inference. It states that in determining whether five or fewer persons own 50 percent of the stock, the stock ownership of each such person is to be considered "only to the extent such stock ownership is identical with respect to each such corporation." The purpose of this requirement is to insure that the same five or fewer individuals together control (by ownership of a majority of the stock) each of the brother–sister corporations. The situation to which this provision is addressed is illustrated in footnote 3 of the court's opinion: one person owns 80 percent of the stock in corporation A and 20 percent of the stock in corporation B, and a second person owns 80 percent of corporation B and 20 percent of corporation A. Although the 80–percent test would be met, there would be no common control. The 50–percent test was necessary to prevent the two corporations in that situation from being treated as under common control.

The congressional requirement that each member of the control group must have an interest in each of the corporations, and that the members of the group together must have more than 50 percent of the stock of each corporation, cannot fairly be read as indicating a congressional intent to permit the 80–percent test to be applied to *different groups of five or fewer stockholders* whose only common bond is that together the stockholders in each group own at least 80 percent of the stock in their particular corporation.

SMITH, Judge, dissenting:

That Treas.Reg. § 1.1563–1(a)(3) (1972) must be sustained unless it is "unreasonable and plainly inconsistent with" I.R.C. § 1563(a)(2) is incontrovertible.[1] The majority admits that the interpretation of section 1563(a)(2) espoused by the regulation "is not wholly unreasonable as a construction of the words appearing in" the statute. Moreover, the majority acknowledges that "[t]he statute itself has been *fairly* criticized as being open to at least four different constructions." (Emphasis added.) Hence, the majority appears to concede that the regulation is not plainly inconsistent with the text of the statute. The majority believes, however, that the regulation is "clearly inconsistent with the legislative history [of the statute] and unreasonable when the purpose, as well as the bare words, of the statute are considered."

The "legislative history" which the majority has in mind consists not of congressional committee reports but of the two explanations prepared by the Treasury Department to accompany its 1969 proposal to Congress that section 1563(a)(2) be amended.[2] The majority derives its holding that the regulation is invalid almost exclusively

1. *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 501, 68 S.Ct. 695, 698, 92 L.Ed. 831 (1948). Hence, the issue in this case is not whether the majority's interpretation of section 1563(a)(2) is more reasonable than the interpretation espoused by the regulation; the issue is whether the regulation is *a* reasonable interpretation of the statute.

2. Technical Explanation and General Explanation of Treasury Tax Reform Proposals, *Hearings Before the House Comm. on Ways and Means on Tax Reform,* 91st Cong., 1st Sess. 5168–70, 5394–96 (1969). It is recalled that Congress enacted without change, as part of the Tax Reform Act of 1969, the amendment of section 1563(a)(2) proposed by the Treasury Department.

from its reading of these explanations. Hence, assuming that the Treasury explanations are more than a possible admission against interest, and can be regarded as persuasive evidence of what Congress intended the amended section 1563(a)(2) to mean, the test of whether the majority is correct can be stated as follows: Is the regulation plainly inconsistent with the meaning of the statute as that meaning has been clarified by the Treasury explanations?

I have read the Treasury explanations carefully. I cannot say that they are contradicted by the regulation.[3] Indeed, they can reasonably be read as supportive of the regulation. That being the case, the issue is not whether plaintiff's interpretation is *as* reasonable as defendant's; clearly that will be true in certain given factual situations. The issue is whether plaintiff has carried its heavy burden of showing the regulation to be unreasonable and plainly inconsistent with the statute. This plaintiff cannot do or at least has not done.

The regulation interprets the 80–percent test in section 1563(a)(2)(A) to mandate only that the same *group* of five or fewer persons own 80 percent of the stock of each corporation. In other words, the regulation interprets the 80–percent test not to require that each member of the group have a stock interest in each corporation.[4] Support for the regulation's interpretation of the 80–percent test can be found in both of the Treasury explanations. The Technical Explanation states:

> Part (1) of this test [namely, section 1563(a)(2)(A)] is satisfied *if the group* of five or fewer persons *as a whole* owns at least 80 percent of the voting stock or value of shares of each corporation, *regardless of the size of the individual holdings of each person.* Thus, for example, part (1) (*but not necessarily part (2)* [the

50–percent identical ownership requirement of section 1563(a)(2)(B)]) is met *whether one person owns 80 percent of the voting stock of each corporation,* four persons each own 20 percent of the voting stock of each corporation, * * *. [Emphasis added.]

The General Explanation states:

> Expanding the 80–percent ownership test from one person to five will close the present opportunity for easy avoidance of that 80–percent test. However, adding the 50–percent identical ownership test will insure that the new expanded definition is limited to cases where the brother–sister corporations are, in fact, controlled *by the group* of stockholders as one economic enterprise. [Emphasis added.]

The quoted portions of the Treasury explanations suggest a reading of the explanations which is both reasonable and harmonious with the regulation. The suggested reading is as follows. The amendment of section 1563(a)(2) was intended, with respect to the 80–percent test, to expand the reference point of voting control or financial interest from the same single person to the same *group* of five or fewer persons. As long as the same group of five or fewer persons possessed 80 percent voting control of or financial interest in each corporation, the 80–percent test would be satisfied regardless of whether each member of the group had an interest in each corporation. However, to insure that there would be adequate *common* ownership of all the corporations, the more than 50 percent identical ownership requirement was added. Its effect would be (a) to insure that one or more members of the group would be shareholders of *all* the corporations and (b) to insure that these members' aggregate identical stock interests in all the corporations would represent greater than 50 percent

---

3. In *Allen Oil Co. v. Commissioner*, 614 F.2d 336 (2d Cir. 1980), the second circuit reached the same conclusion.

4. The regulation is consistent with the text of section 1563(a)(2)(A). Nothing in the text thereof can be read to require that each member of the group have an interest in each corporation.

voting control of or financial interest in each of the corporations.[5]

Under this reading of the Treasury explanations, the 80–percent test and the more–than–50–percent test each have an independent significance. The more–than–50–percent test insures that everyday control of all the corporations emanates from the same source, i. e., from the same shareholder or shareholders who have a greater than 50 percent stock interest in all the corporations. The 80–percent test insures that, in those instances where a greater interest, as, for example, 66⅔ percent or 75 percent voting control or financial interest, is needed, the more–than–50–percent shareholder control group can obtain this additional necessary voting control or financial interest without experiencing the difficulty and attendant delay of dealing with a large number of other shareholders.[6]

Even though a reasonable person can read the Treasury explanations to impute the just described meaning to the 80–percent and more–than–50–percent test and even though this meaning is the meaning of the tests which is espoused by the regulation, the majority holds the regulation invalid. The majority interprets section 1563(a)(2) to require that each shareholder counted in applying the 80–percent test have a stock interest in each corporation. According to the majority, the stock interest is not required to be any specific minimum amount. Hence, the ownership of 1 share in a corporation would, as to that corporation and as to the shareholder owning that 1 share, satisfy the requirement.

The majority's requirement gives rise in the instant case to a result which is incon-sistent with the purpose underlying section 1563(a)(2). Arthur Vogel owned during the tax years in question 77.49 percent of the only class of stock of Vogel Fertilizer Company. During the same years, his stock in Vogel Popcorn Company provided him with 87.5 percent voting control of that corporation. Hence, using his stock alone, he could muster at least 75 percent voting control of both corporations.[7] Possessing this voting control, he had the power to direct the operations of both corporations and to cause the corporations to operate as a unified economic enterprise. Yet the majority holds that the two corporations were not brother–sister and, hence, were each entitled to a full surtax exemption.

The majority's requirement will give rise in other situations to equally unreasonable and inconsistent results. Consider, for example, the situation in which X owns 100 percent of the stock of corporation A and 79.9 percent of the only class of stock of corporation B. The remaining 20.1 percent of the stock of B is owned by Y. Under the majority's interpretation of section 1563(a)(2), A and B are not brother–sister corporations because the 80–percent test is failed.[8] However, if this example is changed merely by having X own all the stock of A except 1 share and having Y own this 1 share, A and B are brother–sister corporations even under the majority's interpretation of section 1563(a)(2).

There is absolutely no rational basis for differentiating the treatment to be accorded to A and B in the second example from the treatment to be accorded to them in the first example.[9] Yet this is precisely what the majority's interpretation does. I real-

5. Greater than 50 percent voting control provides, generally speaking, the power to determine everyday corporate activities.

6. The 80–percent test insures, in short, that all the corporations are closely held. Their being closely held is important because it facilitates their operation as a unified economic enterprise.

7. If he were to need 80 percent voting control of Vogel Fertilizer Company, he could negotiate with a single shareholder, Richard Crain, for the additional necessary voting power.

8. Yet, using merely his stock, X has 75 percent voting control of both corporations and, hence, can cause the corporations to operate as a unified economic enterprise.

9. In both examples, the fact that A and B can be operated as a single economic enterprise is attributable to the stockholdings of X, not to those of Y. Thus, Y's 1 share in A in the second example should not be significant.

ize, of course, that section 1563(a)(2) is a mechanical test, but unfortunately the proof does not exist that Congress intended the mechanical test which the majority has in mind and which leads to the unreasonable results just described.

Therefore, I respectfully dissent.