ESTATE OF ROBERT W. KING, DECEASED, OLGA O. KING, EXECUTRIX, AND OLGA KING, SURVIVING WIFE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; PAUL ROUSSEAU AND OLIVIA H. ROUSSEAU, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of King v. Commissioner
Docket Nos. 8902-80, 15299-80.
United States Tax Court
T.C. Memo 1984-343; 1984 Tax Ct. Memo LEXIS 331; 48 T.C.M. (CCH) 450; T.C.M. (RIA) 84343; July 9, 1984. *331 Petitioners were physicians and partners in an accrual basis partnership of physicians (the Group) under contract to perform medical services for the subscribing members of the Kaiser Foundation Health Plan (the Health Plan). During the years 1948 through 1954, the Health Plan withheld certain amounts properly payable to the Group as compensation pending the Group's fulfillment of its continuing obligations under its contract with the Health Plan. These withheld amounts were subsequently released to the Group 1 year from the time they were withheld. During the period from 1948 through 1954, the amount of money retained by the Health Plan under the contracts increased each year. In 1954 the Health Plan concluded that deferring the payments properly payable to the Group was no longer necessary to protect it against its potential liability; however, the Health Plan continued to hold the money present in the retention fund at that time. Finally in 1964, those funds were released to the Group which distributed said amounts to the physicians who had performed the services for the Health Plan during the years 1948 through 1954. Respondent determined that petitioners were taxable *332 on their distributive shares of the released funds in 1964. Held, 1964 was not the proper year for accrual of the income in question since there was no contingency of sufficient magnitude present to prevent fixation of the right to receive such income. Thus, the proper year for accrual of the income in question was prior to 1964. Leonard A. Marcussen, for the the petitioners. Margaret a. Martin, for the respondent. STERRETT *334 MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: By notice of deficiency dated March 13, 1980, respondent determined the following deficiencies in petitioners' income tax: Docket
Taxable year
No.
Petitioner
ended Dec. 31,
Deficiency
8902-80
Estate of Robert W. King,
deceased, Olga O. King, executrix,
and Olga King, surviving
wife
1964
$11,675.32
15299-80
Paul Rousseau and
Olivia H. Rousseau
1964
2,190.00
The issue for decision is the determination of the proper year for the accrual of an item of income which was paid to petitioners' partnership in 1964. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioner Olga King, executrix of the Estate of Robert W. King, resided in Rocklin, California at the time of filing her petition herein. Olga King and Robert W. King timely filed a joint Federal income tax return for the year 1964 with the Office of the Internal Revenue Service at San Francisco, California. Petitioners Paul R. Rousseau and Olivia H. Rousseau resided in Heriot Bay, *335 British Columbia, Canada at the time of filing their petition in this case. They timely filed a joint Federal income tax return for the year 1964 with the Office of the Internal Revenue Service at San Francisco, California. During the taxable year at issue Robert W. King and Paul Rousseau were physicians and partners in a partnership of physicians called the Permanente Medical Group, an accrual basis partnership under contract to perform medical services for the subscribing members of Kaiser Foundation Health Plan, Inc. The Kaiser Foundation Health Plan, Inc. (hereinafter referred to as the Corporation) was organized as a nonprofit corporation under the laws of the State of California on March 11, 1955. However, the Corporation traces its origins back to the Permanente Health Plan, a nonprofit trust formed on September 8, 1945. On November 25, 1952 the Permanente Health Plan changed its name to the Kaiser Foundation Health Plan (hereinafter referred to as the Trust). Subsequently, on or about March 26, 1956, the Trust discontinued its administrative and contracting functions and transferred the major portion of its assets to the Corporation which assumed the Trust's functions. *336 The remaining assets of the Trust were transferred to the Corporation on or about January 1, 1958, and in 1960 the Corporation filed for and was granted tax-exempt status as a social welfare organization under section 501(c)(4). (Hereinafter, the term "Health Plan" shall refer to both the Trust and the Corporation). The purpose of the Health Plan was to arrange for prepaid medical services without profit to the Health Plan at as low a cost as possible. To this end, the Health Plan entered into an agreement (hereinafter October 1, 1945 agreement) with Dr. Sidney R. Garfield on October 1, 1945. This agreement provided that Dr. Garfield would render medical treatment to all persons entitled to such treatment under the plan. As compensation, Dr. Garfield was to receive, as provided by section 2(a) of the agreement, the following amounts for each individual or family entitled to receive service: (1) Individual Plan: Individual
$2.125 Man and wife
4.8875
Man, wife and one child
5.9925
Man, wife and two or more
children
7.0975
Parent and one child
3.23  Parent and two or more children
4.335 (2) Group Plan: Individual
$1.785 Man and wife
4.5476
Man, wife and one child
5.6525
Man, wife and two or more
children
6.7575
Parent and one child
2.89  Parent and two or more children
3.995 *337 Further, section 2(b) of the agreement provided: In addition to the payments specified in subdivision (a) above, the Health Plan shall, one year after each respective payment is due, make an additional payment to Doctor equal to 17.646% of the amount payable the preceding year under said subdivision (a) above; said additional payment, however, shall be made upon the condition that Doctor has fully performed all services for those on whose account said payment is made, and in the event Doctor fails to provide any such service, the Health Plan may arrange elsewhere for the services unprovided and deduct from such payment the expense which it has incurred for such service. Effective February 22, 1948 Dr. Garfield and several other physicians including Dr. Robert W. King organized a partnership. This partnership assumed Dr. Garfield's obligation to provide medical service for Health Plan members under the October 1, 1945 agreement and the Health Plan agreed to release Dr. Garfield individually from his obligations under the October 1, 1945 agreement and to look to the partnership for the satisfaction of such obligations. The compensation provided Dr. Garfield and his associates *338 under the October 1, 1945 agreement was subsequently changed on October 1, 1948 as follows: effective October 1, 1948, the Health Plan will pay to you, pursuant to section 2(a) of the * * * [October 1, 1945 agreement] and in lieu of the payments heretofore stipulated to be made pursuant to said section, 38.25 per cent of the monthly dues receivable by the Health Plan from its members, and one year thereafter, and pursuant to section 2(b) of said * * * [October 1, 1945 agreement] and in lieu of the payments otherwise stipulated therein, the Health Plan will pay you 6.75 per cent of the amount of said dues; said payment under section 2(b) to be subject, however, to all of the conditions of said section 2(b). On June 29, 1949 the eight physicians, including Robert W. King, M.D., and C. C. Cutting, M.D., entered into a limited partnership for the practice of medicine. This partnership did not include Dr. Garfield. At some time prior to March 2, 1954 such partnership adopted the name "Permanente Medical Group" (hereinafter the Group). The Group succeeded to and assumed all of the business assets and liabilities of the partnership of Dr. Garfield and his associates. On April 1, 1951 the *339 Health Plan and the Group executed a new medical service agreement in which the Group agreed to provide medical services to those persons so entitled pursuant to the hospital and medical service contracts of the Health Plan. In return, section 4(a) of the April 1, 1951 agreement provided: The Health Plan shall pay to Doctors, monthly, thirty-eight and one-fourth per cent (38-1/4%) of the periodic payments actually received during said month by the Health Plan under the medical and hospital service contracts covered by this agreement. Section 4(b) of the April 1, 1951 agreement provided further: In addition to the payments specified in subdivision (a) above, the Health Plan shall, one year after each respective payment is due, make an additional payment to Doctors equal to six and three-fourths per cent (6-3/4%) of the periodic payments received by the Health Plan as described in subdivision (a) above for the corresponding month of the preceding year. Said additional payment, however, shall be made upon the condition that Doctors have fully performed all services for those on whose account said payment is made, and in the event Doctors fail to provide any such service, the Health *340 Plan may arrange elsewhere for the services not so provided, and deduct from such payment the expense which it has incurred for such service. (The payments provided by section 4(b) of the April 1, 1951 agreement will be hereafter referred to as section 4(b) payments). It was further provided by the parties that the contract would continue until terminated upon 6 months' notice in writing by either party. Furthermore, in the event of termination of the contract the Group would still be obligated to continue to furnish services to all subscribers to the Health Plan who, as of the date of termination, were receiving hospital or medical treatment. From a practical standpoint, these continuing obligations could extend for a period of up to 15 months. The Group would also be entitled to continue to receive the section 4(b) payments for a period of 1 year from the date of termination. On October 1, 1951 the April 1, 1951 agreement was modified so that the payments provided by section 4(a) of the April 1, 1951 agreement were increased to 39-3/4 percent of the premiums, and the section 4(b) payments were increased to 7 percent of such premiums. Subsequently, on May 7, 1952 the trustees *341 of the Health Plan and the Group entered into a contract which provided that the Health Plan would acquire and lease to the Group medical equipment and clinical furnishings together with automotive equipment. This agreement provided that in consideration for the acquisition of this property, the Health Plan might defer payments payable to the Group pursuant to section 4(b) of the April 1, 1951 agreement in order to maintain the Health Plan in a sound financial condition. This agreement also provided the Health Plan with the option, in the event of termination of the April 1, 1951 agreement, of conveying to the Group the property then leased to it at the then book value of the property. If the Health Plan elected this option, it could deduct an amount equal to such book value from the amounts then payable to the Group under section 4(b) of the April 1, 1951 agreement. On October 1, 1952 the Health Plan and the Group entered into a supplemental agreement. It provided for another increase of the payments provided in section 4 of the April 1, 1951 agreement. The supplemental agreement increased the payments provided by section 4(a) of the April 1, 1951 agreement to 40.555 percent, *342 and set the payments provided by section 4(b) of such agreement to 6.545 percent. Each month during the period from February 1948 through January 1954 the Health Plan calculated the amount prescribed by the pertinent provision relating to the delayed payments of whichever of the above-described agreements between the Health Plan and the Group was effective. The Health Plan credited these amounts to an account entitled "Retention Funds Payable." The parties referred to these amounts as retentions and the Health Plan segregated this fund from its other assets. However, the Group made no corresponding entry on its books to reflect these amounts. The Group at all times material to this case employed the accrual method of accounting and a fiscal year ending June 30 for both income tax and financial accounting purposes. Each month during the period from February 1949 through January 1954, the Group accrued as income on its books the amount of the retention for the corresponding month of the previous year by debiting accounts receivable and crediting income. During the period from 1948 through 1954, the amount of money retained under the contracts increased each year. The following *343 schedule shows for each of the years indicated the total amount of the "retentions" (first column) and the total amount of the income accruals on the books of the Permanente Medical Group and its predecessor (second column). Also shown on the schedule for each year are the amounts by which the "retentions" exceeded the accruals (third column): Excess of "Retentions"
"Retentions"
Accruals
over Accruals
June 30, 1948
$69,774.91
$69,774.91
June 30, 1949
96,823.38
69,774.91
27,048.47
June 30, 1950
130,753.26
96,823.38
33,929.88
June 30, 1951
175,110.92
130,753.26
44,357.66
June 30, 1952
229,246.15
175,110.92
54,135.23
June 30, 1953
331,531.53
229,246.15
102,285.38
June 30, 1954
234,560.18
185,893.27
48,666.91
Total
$1,267,800.33
$887,601.89
$380,198.44
The Group had always regarded the "retention fund" procedure as undesirable and in light of the increasing retentions it became very dissatisfied with the arrangement. Consequently, at the Group's behest on March 2, 1954 the trustees of the Health Plan concluded that deferring the payments was no longer necessary to protect the Health Plan against its continuing liability *344 to pay for hospital and medical services for subscribers. In addition, the trustees concluded that the amount of money then in the fund appeared sufficient to protect the Health Plan with respect to its continuing obligations to pay for medical services. Therefore, the Health Plan resolved that-- the officers of Kaiser Foundation Health Plan are authorized to negotiate a contract or amendments to existing contracts with The Permanente Medical Group to provide that no further retentions shall be made from moneys otherwise payable to The Permanente Medical Group on account of services provided or to be provided to Health Plan subscribers, except such retentions as may hereafter become necessary to maintain the retention fund held by Kaiser Foundation Health Plan on behalf of The Permanente Medical Group at the balance existing as of January 31, 1954. Between March 2, 1954 and February 27, 1964 the Health Plan and the Group never reduced the provision of the above-quoted resolution to a written agreement. However, the parties acted in accordance with the resolution during such period notwithstanding the lack of a written agreement embodying the resolution. Early in 1954, the Health *345 Plan's "Retention Funds Payable" account was closed to an account entitled "Withheld from Contract Payments to the Perm. Med. Grp." At that time the ending balance in the former account was $380,198.44. After the March 2, 1954 resolution, the Health Plan regarded these funds as belonging to the Group. Thereafter the Health Plan discontinued the practice of withholding payments to the Group, but it continued to hold the $380,198.44 as security. The Health Plan would have been able to draw upon this fund to pay for medical services in the event the Group failed to fulfill its obligation to perform such services. Since, however, the Group did satisfy all its obligations to perform such services, the Health Plan never had occasion to draw upon this money. In 1958 the Group and the Health Plan entered into a new comprehensive medical service agreement effective April 1, 1958. Under this agreement, there was no longer any prepayment for the continuing services not yet performed by the Group. Instead, although the Group was still obligated to meet the Plan's continuing obligations, the Group was compensated for such services currently as such services were actually performed. It *346 is stipulated that all subsequent medical service agreements executed between the Health Plan and the Group contained substantially the same provisions. In 1964 the Health Plan decided that the retention of the $380,198.44 was no longer necessary and therefore released it to the Group. The money was paid in two equal installments of $190,099.22 each on March 2, 1964 and September 28, 1964, and was distributed by the Group to those doctors who performed services between the years 1948 and 1954. The Health Plan never paid the Group any interest with respect to this money.Paul Rousseau's correct distributive share of this item was $4,968 while Robert W. King's correct distributive share was $23,159.14. No part of the $380,198.44 in income distributed to the Group in 1964 was ever included on any of the Group's Federal income tax returns. Instead, there was attached to the partnership return of the Permanente Medical Group for its fiscal year ended June 30, 1964 a statement which read as follows: STATEMENT FOR THE PARTNERSHIP RETURN OF THE PERMANENTE MEDICAL GROUP TAXABLE YEAR ENDED JUNE 30, 1964 The partnership has received the sum of $190,099.22 representing a distribution *347 by Kaiser Foundation Health Plan of funds belonging to certain partners of The Permanente Medical Group and Garfield Associates, a predecessor partnership. Said sum was released pursuant to contract executed on February 27, 1964 by Kaiser Foundation Health Plan and The Permanente Medical Group, copy of which is attached. The monies comprising this fund were withheld during the fiscal years ending June 30, 1948 to 1954, inclusive, by predecessors of Kaiser Foundation Health Plan from compensation payable to the above partnerships for medical services rendered during such years. Such monies were held as security for the performance of certain contingent obligations of Garfield Associates and The Permanente Medical Group. Garfield Associates was dissolved effective June 30, 1949. Legal counsel has advised that said monies constituted partnership income in the years 1948 to 1954, inclusive, and that they are therefore not includable in taxable income of the recipients in the year of distribution. The sum in question has therefore not been included in partnership income reported in this return. Individual recipients have been advised of counsel's opinion. The partnership return *348 of the Permanente Medical Group for its fiscal year ended June 30, 1965 made no mention of the additional $190,099.22 received from Kaiser Foundation Health Plan, Inc. on September 28, 1964 pursuant to the February 27, 1964 contract. Robert W. King received $11,579.57 of the $190,099.22 distributed by the Permanente Medical Group on March 2, 1964, and $11,579.57 of the $190,099.22 distributed by the Permanente Medical Group on September 28, 1964; while petitioner Paul Rousseau received $2,484 of the $190,099.22 distributed by the Permanente Medical Group on March 2, 1964, and $2,484 of the $190,099.22 distributed by the Permanente Medical Group on September 28, 1964. Neither Robert W. King nor Paul Rousseau has ever included any amount with respect to the $380,198.44 in income on any tax return for any taxable year. Instead, both King and Rousseau attached statements explaining these omissions to their 1964 Federal income tax returns. The statement attached to the joint Federal income tax return of Robert W. and Olga King read as follows: In addition to other sums, there was distributed to me during my taxable year ended December 31, 1964 by THE PERMANENTE MEDICAL GROUP, a Limited *349 Partnership, the sum of $23,159.14. Legal counsel has advised: (1) that these funds constituted partnership income to me as a member of SIDNEY R. GARFIELD & ASSOCIATES and THE PERMANENTE MEDICAL GROUP for my taxable years ended December 31, 1949 through and including December 31, 1954; (2) that such funds were erroneously omitted from partnership income both on the returns of the above partnerships and on my individual income tax returns for the aforesaid years; (3) that collection of the tax thereon is barred by the Statute of Limitations. Said funds are therefore omitted from taxable income reported on this return. Petitioners Paul and Olivia H. Rousseau attached a similar statement to their joint Federal income tax return for the calendar year 1964. In his notices of deficiency dated March 30, 1980, respondent determined that the distibutions received by Robert W. King and Paul Rousseau constituted taxable income for the taxable year ended December 31, 1964. It is stipulated that the statute of limitations does not bar the assessment and collection of any deficiency in income tax due from any of the petitioners for the taxable year 1964. OPINION The parties are in agreement *350 that the $380,198.44 distributed to the Group in two installments during 1964 constituted personal service income. However, the parties disagree as to the proper year for the accrual of such income by the Group. Section 702(a), I.R.C. 1954, requires that a partner include in his income his distributive share of the partnership's taxable income or loss. The proper year for such inclusion is set forth in section 706(a) which provides: In computing the taxable income of a partner for a taxable year, the inclusions required by section 702 and section 707(c) with respect to a partnership shall be based on the income, gain, loss, deduction, or credit of the partnership for any taxable year of the partnership ending within or with the taxable year of the partner. Thus, if the $380,198.44 of income in question was properly accruable during the Group's taxable year ended June 30, 1964, then respondent is correct in his assertion that petitioners are liable for the tax on their distributive shares of such income for their taxable year ended December 31, 1964. If, however, *351 as petitioners contend the proper year for the accrual of such income was during the taxable years 1948 through 1954, then, since such taxable years are now closed, collection of the tax thereon is barred by the statute of limitations. An accural basis taxpayer is not taxed on income until all events have occurred which fix the right to receive such income and the amount thereof can be determined with reasonable accuracy. Sec. 1.451-1(a), Income Tax Regs.Spring City Foundry Co. v. Commissioner,292 U.S. 182, 184-185 (1934). It is thus the right to receive and not actual receipt that determines taxability. Furthermore, the mere existence of a contingency in and of itself is insufficient to prevent fixation of the right. Charles Baloian Co. v. Commissioner,68 T.C. 620, 628 (1977), affd. in an unpublished opinion (9th Cir 1982); see Burnett v. Commissioner,356 F.2d 755 (5th Cir. 1966). Rather, the proper test to be applied is whether such right has matured, without substantial contingency. Dally v. Commissioner,227 F.2d 724, 726 (9th Cir. 1955); *352 Charles Baloian Co. v. Commissioner,supra.
In the present case, we are faced with an unusual situation in that it is respondent who is arguing for deferral of the accrual of an income item. It is respondent's position that the $380,198.44 distributed to the Group during 1964 was not properly accruable until that time. The equities in this case are clearly with respondent since a holding for petitioners will result in no tax ever being paid on the income in question due to the action of the statute of limitations. Nevertheless, we simply cannot conclude that there was any contingency in this case of sufficient magnitude to prevent fixation of the right to receive the income at issue. In the instant case, both the partners to whom the income was accruable and the amount of such income was determinable with reasonable accuracy well before the actual receipt of such amounts in 1964. The $380,198.44 in question was paid not to the Group's partners as of 1964 but to those partners who performed services for the Health Plan during the years 1948 through 1954. Furthermore, the amount they eventually received was fixed as of 1954 at which time such funds were *353 considered to belong to the Group. In point of fact, the Health Plan's only interest in the retention fund after January 31, 1954 was merely as a security interest. It is true that for some period of time following the termination of the retention procedure in 1954 the Health Plan could have conceivably drawn upon the retained $380,198.44 to pay for medical services in the event the Group failed to fulfill its continuing obligations under their contract. However, not only did such a contingency never occur but the likelihood of such a contingency ever occurring appears to have been extremely remote. Indeed, during the entire period during which the retention procedure was in effect there is no evidence of a single occasion where the retention fund was drawn upon by the Health Plan to satisfy the Group's continuing obligations. Furthermore, the retained funds were paid not to the partners as of 1964 when the amounts were actually released but instead to the partners who performed the services during the years 1948 through 1954--the years during which the funds were accumulated. This factor obviously militates against respondent's contention that the amounts were paid for continuing *354 services since several partners who received distributive shares of the released amounts left the partnership prior to 1954. In light of this fact, it is clear as the record bears out that the retention fund did indeed belong to the Group after 1954. Finally, respondent also contends that the retained funds did not become properly accruable until the April 1, 1951 contract terminated and the Group had performed its "continuing obligations" following such termination. However, respondent's contention ignores the undisputed fact that the 1951 contract in question was superseded by a new comprehensive contract in 1958 which completely obliterated any vestiges of the retention procedure employed during 1948 through 1954 by providing for current payment by the Health Plan to the Group for any continuing services performed by the Group. Thus, if the retained funds in question were not properly accruable in the years 1948 through 1954 or in 1954 alone, such amounts would have surely been accruable at least by 1958. Fortunately, we need not decide which of those years was the proper year for the accrual of the amounts in question but only that the proper year was not 1964. In light of *355 that determination Decisions will be entered for the petitioners.